

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-19-2000

# Wilson v. Russo

Precedential or Non-Precedential:

Docket 98-5283

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Wilson v. Russo" (2000). *2000 Decisions.* Paper 105.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/105

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 19, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-5283

FRANKLIN WILSON, Appellant

v.

DARRIN J. RUSSO, INDIVIDUALLY AND AS A POLICE
OFFICER OF THE FRANKLIN TOWNSHIP POLICE
DEPARTMENT, SOMERSET COUNTY, NEW JERSEY;
CLEMENT WORONIECKI, INDIVIDUALLY AND AS A
POLICE OFFICER OF THE FRANKLIN TOWNSHIP POLICE
DEPARTMENT, SOMERSET COUNTY, NEW JERSEY;
FRANKLIN TOWNSHIP POLICE DEPARTMENT, SOMERSET
COUNTY, NEW JERSEY; TOWNSHIP OF FRANKLIN,
SOMERSET COUNTY, NEW JERSEY; JOHN DOES, 1-15,
represent 1 or more employees or agents of defendant,
Franklin Township Police Department who, singly or in
combination participated in the unlawful search, false
arrest and false imprisonment of the plaintiff; 16-30,
represent 1 or more employees or agents of said
defendant who, singly or in combination participated in
the supervision and training of the defendants, Russo,
Woroniecki, and John Does 1-15; 31-45, represent 1 or
more employees or agents of defendant, Township of
Franklin who, singly or in combination, participated in
the supervision and training of said individual defendants.

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 97-cv-00546)
District Judge: Honorable Mary Little Cooper

Argued: November 4, 1999

Before: BECKER, Chief Judge, GARTH, Circuit Judges
and POLLAK,* District Judge

(Filed: May 19, 2000)

IRINA ELGART, ESQUIRE (ARGUED)
Wolff & Samson
5 Becker Farm Road
Roseland, NJ 07068

LOUIS S. RAVESON, ESQUIRE
Urban Legal Clinic, Rutgers-Newark
15 Washington Street
Newark, NJ 07102

Counsel for Appellant

RICHARD J. GUSS, ESQUIRE
 (ARGUED)
Bivona, Cohen, Kunzman, Coley,
 Yospin, Bernstein & DiFrancesco
15 Mountain Blvd.
Warren, NJ 07059

Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

Franklin Wilson was arrested and spent a month in jail for an armed robbery he did not commit. As plaintiff in this civil rights lawsuit arising under 42 U.S.C. S 1983, he claims that his arrest and subsequent incarceration violated his federal and state constitutional rights to be free from arrest and detention without probable cause. The crux of his claim is that the arresting officer, defendant Darrin J.

_____

* Honorable Louis H. Pollak, United States District Court Judge for the
Eastern District of Pennsylvania, sitting by designation.

2

Russo, both lied and omitted material facts during his application for Wilson's arrest warrant. Russo told the judge that two victims, who each had ample opportunity to view the robber, had stated that the assailant was between 6'3" and 6'5". Russo did not, however, tell him that Wilson's driving abstract showed him to be 5'11". Nor did Russo tell the judge that one of these eyewitnesses did not identify Wilson when shown a photographic array. What he did tell him was that the other victim positively identified Wilson, and that someone else had seen Wilson in the vicinity near the time of the robbery. Wilson urges us to decide that Russo omitted the exculpatory facts with "reckless disregard for the truth" and that the warrant affidavit would not have established probable cause if the officer had been more forthcoming.

The District Court found that Russo had qualified immunity and granted summary judgment in his favor. In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting. Viewing the facts in the light most favorable to the plaintiff, we conclude that Russo acted in reckless disregard for the truth in some, but not all, of his omissions and assertions to the judge. However, since none of these misstatements or omissions were material, in that the warrant would have established probable cause even if Russo had not made them, we conclude that Wilson's right to be free from arrest without probable cause was not violated. Therefore, we affirm the grant of summary judgment.1

_____

1. Wilson also appeals the District Court's grant of summary judgment to the officer who initiated the investigation, Clement Woroniecki, who, he alleges, violated his rights by inadequate and sloppy investigation. However, there is insufficient evidence in the record that Woroniecki's actions effected a deprivation of Wilson's rights, let alone an unconstitutional deprivation. As we discuss further infra at note 5, negligent police work, even if proven, does not violate the due process

I. Facts and Procedural History

A. The Robbery and Preliminary Investigation

On February 3, 1995, Officers Lipp and Woroniecki of the Franklin Township (New Jersey) Police Department responded to a call reporting an armed robbery at the Great Expressions Floral Shop in the Franklin Towne Center. Detective Woroniecki interviewed Renee Braverman, the owner of the shop, and Graham Druce, an employee in the shop. They both said that the robber was in the store from a little before 3:00 pm until approximately 3:50 pm. When the robber entered the shop, Braverman was discussing a bridal order with a customer. Several times during the robber's visit, Druce approached him and asked him if he needed assistance, which he repeatedly declined. The bridal order customer left around 3:50, and the robber brought a glass vase and candle to the counter, behind which Braverman was standing. The robber asked Druce, who was standing in the back room, if the candle would cause the glass vase to break. When Druce walked towards the counter the robber put his left hand on Druce's right shoulder and told Braverman to empty the register quickly and put the money in a brown paper bag along with the candle and vase. Druce and Braverman both said they saw a small revolver in his right hand.

Braverman, a white woman who is "around five six," described the robber as a light skinned black male, approximately 30 years old, "very tall," between 6'2" and 6'4", between 190 and 200 pounds, with black wavy hair, a waist-length light denim jacket, cream colored sweater, and blue denim jeans. Druce, a "five-five,five-six" white man, described the robber as a "very tall male, light black in color, his middle 20s, about 25, about 6'5" tall, maybe a
_____

clause. We will therefore affirm the District Court's grant of summary judgment for Woroniecki without further discussion.

Wilson originally sued the Franklin Township Police Department and the Township of Franklin, but he did not appeal the District Court's grant of summary judgment as to those parties.

little bit taller." He told the police the robber had an athletic build, was clean shaven, had well groomed short hair and was wearing a blue denim jacket, blue denim jeans, and sneakers. Druce said that if he saw a picture of the robber he was absolutely certain he could pick him out because of his noticeable height.

Detective Bisignio, also of the Franklin Township Police, canvassed the area for witnesses. Kelly N. DaVila, who worked in a nearby dental office, told him that she had seen a dental patient named Franklin Wilson in the Franklin Center, walking away from the Mayfair Foodtown Area towards a pizza shop after 3:00 that day, "probably about a half hour" before the police officers arrived (making her estimated viewing around 3:30). She described Wilson as a 6'0" tall, clean shaven, thin, light-skinned black man with brown hair and brown eyes. She told Bisignio that he had some entanglement with heroin because his dental records indicated that he was seeking methadone treatment.

Bisignio relayed this information to Woroniecki, who conducted a criminal history and Department of Motor Vehicles (DMV) check of Wilson. The criminal history report listed Wilson as being 5'10" and weighing 160 pounds. The DMV record apparently listed him as being 5'11". Woroniecki received a photograph of Wilson from the Middlesex County Identification Bureau, which he took to the Somerset County Sheriff 's Office in order to compile a photographic lineup. The office compiling the photographic array was apparently not aware of the physical descriptions of the witnesses. On the afternoon of February 6, Woroniecki fell ill and ceased all involvement in the investigation of the floral shop robbery.

Detective Russo took over the investigation. On February 6, he was provided with Officer Lipp's report and the photographic array from the Somerset County Sheriff 's Office. Lipp's report includes a summary of the robbery and a description of the robber that combined the Druce and Braverman physical descriptions. The report identifies the robber as between 6'3" and 6'5". It does not mention DaVila's assertion that she saw Wilson. Russo claimed that he did not review any other officer's notes. He testified that

5

he reviewed and authorized the photographic array without knowing what the witnesses had said about the robber.

Russo showed the photographic array to Braverman and Druce individually. He told them each that the robber might not be in the array, and that if they were to identify anyone they must be one hundred percent certain that the person they were identifying was the person who robbed them. Braverman immediately selected Wilson's photograph as representing the robber. Druce studied the array for about two minutes, indicating no recognition, andfinally concluded that he could not say with certainty that he recognized the robber among them.

Russo testified that he does not remember whether he knew Wilson's height and weight when he applied for the warrant. When questioned during deposition about whether he knew Wilson's actual height and weight, he said"Well, it'd probably be on the driver's license abstract because I obtained that actually just for his address." In his response to Russo's summary judgment motion, Wilson made the uncontroverted assertion that this information is on the driver's abstract.

B. The Arrest Warrant Application, Arrest, and
        Initiation of Suit

Russo met with a prosecutor and reviewed the facts before the two of them sought a search warrant from Superior Court Judge Dilts. Through his responses to the questions of the prosecutor, Russo informed Judge Dilts that two witnesses had described the robber as a light skinned black male "six-three to six-five." He did not tell him that Wilson's driver's abstract stated that he was 5'11", or that his criminal history report stated that he was 5'10". Russo also represented that he had created a photographic array "as a result of the physical descriptions." This is contrary to what the record indicates, which is that those making the photo array had the photograph of Wilson, but were never told of the victims' descriptions of the robber. He told the judge that the owner of the florist shop unequivocally picked Wilson out of a photo lineup. He did not tell him that the other witness had failed to identify

6

Wilson as the robber when shown the same photo array. Russo stated that an employee of a nearby dentist's office who recognized Wilson had seen him around three o'clock. He did not inform the judge that she had stated that she saw Wilson around 3:30, by which time the robber was already in the shop.

We also note that Russo answered the prosecutor's questions as if he had been there himself, suggesting that he had been the primary investigator and interviewer at the scene of the crime. He did not tell the judge that, in the photo array, Wilson looked ethnically different from the others.[2] Russo also did not inform the judge that height and weight were not indicated on the photo lineup.

On the basis of Russo's testimony, Judge Dilts issued a warrant of arrest and to search for evidence. Russo executed the warrant the evening of February 6. Wilson was incarcerated for a month, after which the Somerset Grand Jury refused to indict him. Thereafter, he brought this suit against Russo, Woroniecki, and the Franklin Township Police Department under 42 U.S.C. S 1983, alleging that his Fourth, Fourteenth, and Fifth Amendment rights were violated, as well as his rights under the New Jersey Constitution, and the New Jersey common law. The defendants moved for summary judgment, and the District Court granted the motion.[3] Wilson appealed.

_____

2. We note this omission not because we think there was a marked difference in appearance, but because Wilson's briefs focus on it. As we discuss infra, our independent review of the photographic array satisfies us that although Wilson has slightly different features than the other five faces pictured, no reasonable jury could find that the difference was significant or prejudicial.

3. The District Court did not address the officers' motion for summary judgment on the state law claims in its decision. Therefore, although we will affirm the grant of summary judgment on the federal claims, we will remand to the District Court so that it may evaluate the state claims and determine whether or not to retain jurisdiction of them under 28 U.S.C. S 1367(c).

II. The Right to Be Free of Unlawful Arrest

To recover under 42 U.S.C. S 1983, Wilson must establish that a state actor engaged in conduct that deprived him of "rights, privileges, or immunities" secured by the constitution or laws of the United States. See Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). Because Russo has fairly raised a qualified immunity defense, Wilson has a further burden. According to the doctrine of qualified immunity, law enforcement officers acting within their professional capacity are generally immune from trial "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne, 119 S.Ct. 1692, 1699 (1999) (quoting Harlow v. Fitzgerald , 457 U.S. 800, 818 (1982)).

The qualified immunity defense requires that we engage in a two-step analysis. First, we must "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." Conn v. Gabbert , 119 S. Ct. 1292, 1295 (1999). Only if he has should we "proceed to determine whether that right was clearly established at the time of the alleged violation." Id. Summary judgment is appropriate if no reasonable juror could conclude that Wilson's clearly established rights were violated. See Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995).

This does not mean that the jury determines the contours of the right. Rather, after making a legal determination about the existence of a right, and whether it is clearly established, we determine whether the facts on the record are such that a jury could conclude that the clearly established right was violated. See id.  As a methodological matter, we commonly work backwards: We arrange the facts in the light most favorable to the plaintiff, and then determine whether, given precedent, those"facts," if true, would constitute a deprivation of a right. And then, if necessary, we determine if the right is clearly established. In this case, since we conclude that Wilson has not adduced facts from which a jury could conclude that his constitutional rights were deprived at all, we need not engage in the second inquiry.

8

Wilson contends that he was arrested without probable cause in violation of his Fourth Amendment right to be free from unreasonable seizure. He acknowledges that he was arrested pursuant to a warrant, but claims that the warrant was not supported by probable cause. However, the statements given to Judge Dilts by Officer Russo clearly establish probable cause: He was told that a robbery had taken place; that the descriptions of the victims were used to compile a photo array; that one of the victims had quickly and positively identified the suspect from the photo array; and that an employee in a nearby establishment had seen Wilson in the vicinity near the time he supposedly entered the flower shop. See infra Section I.B.

In light of these facts, the only way that Wilson can succeed is if he proffers evidence that Russo recklessly disregarded the truth in his warrant application, and that a warrant application based on what Russo should have told the judge would have lacked probable cause. As this recitation suggests, an arrest warrant issued by a magistrate or judge does not, in itself, shelter an officer from liability for false arrest. See Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997). Rather, a plaintiff may succeed in a S 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;" and (2) that "such statements or omissions are material, or necessary, to the finding of probable cause." Id.4

A. Reckless Disregard for the Truth

With these precepts in view, we must first consider whether Wilson adduced sufficient evidence that a

_____

4. Wilson argues that because a jury could conclude that Russo lied, Russo loses the protection of qualified immunity regardless of the import of the lie. Adopting his argument would not affect the result in this case because we ultimately conclude that even if Russo had been perfectly straightforward in his warrant application, there would have been probable cause to arrest Wilson.

reasonable jury could conclude that Russo made statements or omissions that he "knew [were] false, or would have known [were] false except for his reckless disregard for the truth." United States v. Leon, 468 U.S. 897, 923 (1984); cf. Franks v. Delaware, 438 U.S. 154 (1978). In Franks, the Court held that where a defendant showed by the preponderance of the evidence that a false statement necessary to the finding of probable cause was made "knowingly and intentionally, or with reckless disregard for the truth," the constitution requires that any evidence derived from the exercise of that warrant had be excluded from a criminal trial. Id. at 155. But as the Court of Appeals for the District of Columbia Circuit has lamented, "[u]nfortunately, the Supreme Court in Franks gave no guidance concerning what constitutes a reckless disregard for the truth in fourth amendment cases, except to state that `negligence or innocent mistake[is] insufficient.' " United States v. Davis , 617 F.2d 677, 694 (D.C. Cir. 1979) (quoting Franks, 438 U.S. at 171). This case, with its hybrid allegation (Russo purportedly doctored some facts and failed to inform the judge of others) requires us to acknowledge that reckless disregard for the truth means different things when dealing with omissions and assertions, and to explain the different methodologies for dealing with each.

1. Omissions

All storytelling involves an element of selectivity. We cannot demand that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip (". . . the witness blushed when I mentioned the gun, and blinked six times while studying the photographic array. I noticed his hand crept up to his lips (which were chapped) . . ."). On the other hand, one of the reasons for requiring a neutral magistrate to evaluate probable cause is that an uninterested party is presumably better suited to review and evaluate the facts than an officer pursuing a lead. "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which

10

reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." Johnson v. United States, 333 U.S. 10, 13–14 (1948) (cited in Payton v. New York, 445 U.S. 573, 586 n.24 (1980)). It follows that a police officer cannot make unilateral decisions about the materiality of information, or, after satisfying him– or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence.

Recognizing the tension between the extreme models that could arise if either of these competing concerns were taken alone––requiring a police officer to tell all, and permitting a police officer to independently determine materiality––we follow the common sense approach of the Court of Appeals for the Eighth Circuit and hold that omissions are made with reckless disregard if an officer withholds a fact in his ken that "[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know." United States v. Jacobs, 986 F.2d 1231, 1235 (8th Cir. 1993). In Jacobs, the court concluded that the officer acted with reckless disregard when he told the magistrate that a drug sniffing dog showed "interest" in the bag of the defendant but failed to inform the magistrate that it had not gone into "alert." Id. at 1234. "Because of the highly relevant nature of the omitted information," the court held that "the omission occurred at least with reckless disregard of its effect upon the affidavit." Id.

Russo alleges that Wilson made the following omissions in his warrant application: (1) he did not tell the judge that although Officer Lipp's investigative report stated that the robber was between 6'3" and 6'5", Wilson's driver's abstract indicated that he was 5'11"; (2) he did not tell the judge that Druce did not pick Wilson out of an array; (3) he did not tell the judge that in the photo array, Wilson looked ethnically different from the others; and (4) he did not mention that height and weight were not indicated on the photo array.

Applying the test adopted above, we address these contentions in turn. Any reasonable person would know

11

that the significant height differential, and the fact that an eyewitness–victim did not identify Wilson, were"the kind of thing[s] the judge would wish to know." Jacobs, 986 F.2d at 1235. On the other hand, we do not believe that an officer can be expected to communicate the apparent ethnicity of the victim, or slight variations in appearance on the photographic line–up absent circumstances making these factors more important or prejudicial. Finally, the fact that height and weight were not listed on the photo array is so routine as to be unremarkable to a judge. Although these latter facts could be used for impeachment at trial, a police officer cannot be expected to present a judge with complete background.

2. Assertions

Unlike omissions, assertions can be made with reckless disregard for the truth even if they involve minor details-- recklessness is measured not by the relevance of the information, but the demonstration of willingness to affirmatively distort truth. In applying the reckless disregard test to assertions, we have borrowed from the free speech arena and equated reckless disregard for the truth with a "high degree of awareness of [the statements'] probable falsity." Lippay v. Christos, 996 F.2d 1490, 1501 (3d Cir. 1993) (quoting Garrison v. Louisiana , 379 U.S. 64, 74 (1964)); see also United States v. Clapp, 46 F.3d 795, 800 (8th Cir. 1995) (reckless disregard for the truth is exhibited when expressing that which was not "believed or appropriately accepted" as true). An assertion is made with reckless disregard when "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." Clapp, 46 F.3d at 801 n.6.

Applying these tests to this case, Russo had reasons to "doubt the accuracy" of his intimation that he had personally investigated the entire case and interviewed the witnesses after the robbery. More importantly, a jury could conclude that Russo "must have entertained serious doubts about the truth of his statement" that the dental worker had seen Wilson around 3:00, instead of around 3:30.

12

Because he told the judge about DaVila's identification, Russo must have learned of DaVila's statement from somewhere; a jury could infer that he learned of it from the transcript of DaVila's statement or a complete report, either of which would include her statement that she saw Wilson about a half an hour before the police arrived, which would place her sighting at about 3:30. If Russo knew of the time difference, he had "obvious reasons to doubt" his assertion to the judge that a witness saw Wilson around 3:00.

As to the other information from the other officers' reports, Wilson did not adduce any evidence that Russo would have examined these reports as a matter of course or policy, or any evidence from which a jury could infer knowledge of their content. Moreover, there is no evidence that Russo knew that the array was developed from Wilson's photo alone. Therefore, a jury could not conclude that his representation that the array was made "as a result of the physical descriptions" was made with reckless disregard of the truth.5

B. Materiality

Since there was sufficient evidence of omissions and assertions made knowingly, or with reckless disregard for the truth, we turn to the next step of the reconstructive surgery required by our jurisprudence, and assess whether the statements and omissions made with reckless disregard of the truth were "material, or necessary, to the finding of probable cause." Sherwood, 113 F.3d at 399.6 To determine

_____

5. Wilson also attempts to inject a due process argument into what is primarily a fourth amendment claim, arguing that the officers were negligent in their investigation. However, negligence by public officials is not actionable as a due process deprivation of a civil right. See Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995) ("[T]he issue is not whether the information on which police officers base their request for an arrest warrant resulted from a professionally executed investigation; rather, the issue is whether that information would warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."); see also Daniels v. Williams, 474 U.S. 327 (1986); Colburn v. Upper Darby Township, 946 F.2d 1017 (3d Cir. 1991)).

6. Wilson submits that even if the statements are not material, he should at least get nominal damages for Russo's failure to provide the judge

13

the materiality of the misstatements and omissions, we excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the "corrected" warrant affidavit would establish probable cause. See Sherwood, 113 F.3d at 400. If it does, the grant of summary judgment should be affirmed, for even if there had not been omissions and misrepresentations in Russo's presentation to Judge Dilts, Wilson would have been arrested.

Probable cause exists if there is a "fair probability" that the person committed the crime at issue. See Sherwood, 113 F.3d at 401. "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Orsatti, 71 F.3d at 483. A police officer may be liable for civil damages for an arrest if "no reasonable competent officer" would conclude that probable cause exists. Malley v. Briggs, 475 U.S. 335, 341 (1986).

_____

with exculpatory information. He relies on the Supreme Court's decision in Carey v. Piphus, 435 U.S. 247, 266 (1978), which stated that a violation of procedural due process was actionable without a need to prove actual injury, or actual damages. See also Smith v. Chicago, 913 F.2d 469, 472–73 (7th Cir. 1990). In Smith, the court held that actual damages for improvident police work leading to arrest was inappropriate because probable cause existed, so that no actual harm flowed from the recklessness, but allowed the award of nominal damages of $1 for the due process violation. See also Sutton v. Board of Education, 958 F.2d 1339, 1352 (6th Cir. 1992) ("The denial of procedural due process is actionable for nominal damages without proof of actual injury."). On the strength of these cases, Wilson argues that Russo's omissions and fabrications are a harm independent of the injury of arrest. Although we find the argument interesting, we would not address it today even if we found its requirements met, because it was not raised in the complaint, at the district court level, or even in the opening briefs on appeal. Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994) (issues raised for the first time on appeal will not be considered). It was articulated for the first time in supplemental letter memoranda sent to the court less than a month before oral argument.

14

The defendants maintain that a positive identification by a victim is sufficient by itself to establish probable cause that the identified party was the offender. While we agree that a positive identification by a victim witness, without more, would usually be sufficient to establish probable cause, this qualified precept cannot be rendered absolute. Independent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the arresting officers could outweigh the identification such that probable cause would not exist. Each case must therefore be examined on its facts.

For example, if two identifying witnesses had told the officer that the robber was 7', and the officer knew that the person in the photograph was 5', the positive identification would not be enough. Likewise, an otherwise credible victim identification would not provide probable cause if police officers contemporaneously possessed reliable DNA evidence which determined conclusively that the accused could not have committed the crime. Or, if Druce had, equally firmly, picked another person from the photo array, Braverman's identification might not have been sufficient for Russo to conclude that Wilson "probably" committed the crime. "An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999).7

_____

7. We recognize that the Seventh Circuit has used language suggesting that exculpatory evidence or evidence of unreliability is totally irrelevant.
See Tangwall v. Stuckey, 135 F.3d 510 (7th Cir. 1998). In Tangwall, a woman who had been raped called the police because she said she was convinced that a man that she had been observing for some time in the restaurant in which she worked was her attacker. She had previously described her attacker differently; the man in the restaurant was slightly older, heavier, taller, and had a different color hair and eyes than her original description. There was no corroborating evidence or independent exculpatory evidence. The court concluded that the officers had qualified immunity in that case, stating along the way that"the alleged discrepancies between Smith's original description of her attacker and Tangwall's appearance on the evening of his arrest do not affect our inquiry into whether Detective Stuckey's actions were objectively

15

The cases that the defendants cite for their argument fall into two basic camps: (1) those in which there was no exculpatory evidence or evidence of witness unreliability, such as United States v. Harris, 956 F.2d 177, 180 (8th Cir. 1992); and (2) those in which the court concluded that a positive identification was not fatally undermined by unreliability or exculpatory evidence, such as Sharrar v. Felsing, 128 F.3d 810 (3d Cir. 1993) and Lallemand v. University of Rhode Island, 9 F.3d 214 (1st Cir. 1993). The first class of cases is inapposite here. Looking at the second class of cases, we find that courts have consistently considered the context of an identification, and have not stated that police can rely on any witness accusation, however unreliable or unbelievable.

For example, in Sharrar we affirmed the principle that "[w]hen a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause." 128 F.3d at 818 (emphasis added). We concluded in that case that when the witness initially gave one name, but then identified her husband as her attacker, it was

_____

reasonable in light of clearly established law." Id. at 517 (emphasis added). Although we would have no reason to take issue with the court's ultimate disposal of that case on its facts, especially given the relatively minor nature of the discrepancies, we find this statement overbroad, in that it appears to treat identifications as unimpeachable, and conflicts not only with the cases and language cited in the same section of the opinion, see id. at 516 (citing United States v. Decoteau, 932 F.2d 1205, 1207 (7th Cir. 1991) for the proposition that "once a putative victim . . . has positively identified her attacker to the police and they have no reason to disbelieve her, the officers `need not take any additional steps to corroborate the information regarding the crime before taking action.' ") (emphasis altered)), but with suggestions in the case itself, in which the court went out of its way to discuss reasons to discount discrepancies in part because of the special circumstance of rape. See id. at n.11. Therefore, we are unwilling to follow the reading of that case urged by the defendants. We are also skeptical that the Seventh Circuit would adopt such a sweeping interpretation and consider there to be probable cause to arrest someone identified as the assailant if the police officers were aware that the victim, like the boy who cried wolf, had previously firmly identified several different people as her attacker and repeatedly called the police demanding that they be arrested.

16

reasonable for the officer to "assess Gannon's demeanor, find her story credible, and rely on her subsequent identification of her husband as the attacker" in part because it was a domestic violence case. Id. Likewise, in Lallemand, the First Circuit concluded that discrepancies in a victim's description were "trivial, given their nature" and in light of the positive identification, clearly implying that non-trivial discrepancies, or external evidence powerfully undermining the reliability of the witness's identification, might translate into a finding that there was no probable cause. 9 F.3d at 217.8 We reject the rule suggested by the defendants and engage in the routine probable cause analysis, weighing the inculpatory evidence against any exculpatory evidence available to the officer.

The strongest inculpatory evidence is clearly the positive identification. Braverman had considerable opportunity to view the robber at the scene of the crime, and she exhibited a high level of certainty. There were three days between the crime and identification, so while it was not an entirely fresh identification, not so much time had passed as to call into question her recollection. Granted, Braverman's testimony should be viewed with some skepticism because her identification of Wilson was inherently incompatible with her description of the robber--according to the information available to Russo (Lipp's report), Braverman (and/or her coworker) originally described the robber as between 6'3" and 6'5". Although she did not know it, in identifying Wilson she identified someone much shorter. Both of these identifications cannot be correct. However,

_____

8. As in this case, Lallemand involved, among other things, a discrepancy in height. The victim initially described her attacker as 6', while Lallemand is 6'7". But later the victim told the police that her attacker was "much taller" than a police officer who was over 6', 9 F.3d at 215 n.1, and no other witness (like Druce) had indicated his height, and the court acknowledged no independent exculpatory evidence. We do not disagree with the result, but think it was a simpler case. More importantly, we note that it did not apply a per se rule; on the contrary, it carefully examined the facts available to the officer that might be deemed to undercut the victim's credibility, such as her intoxication, and concluded that her identification was still reliable and probable cause existed even when these facts were taken into account.

17

this indication of unreliability does not, from the vantage point of the arresting officer, fatally undermine the forceful positive identification. Added to this identification is the fact that DaVila testified that she saw Wilson in the vicinity near the time of the theft.

On the other hand, there are three exculpatory facts that Russo should have mentioned: (1) the robber was originally identified as someone 6'3" to 6'5", while Wilson is four to seven inches shorter;9 (2) one of the two victim-witness with ample opportunity to view the robber failed to identify Wilson when shown a photo array; and (3) DaVila saw Wilson out in the shopping center when he was supposedly in the flower shop. But these exculpatory facts, when weighed against the inculpatory facts, are not strong enough to undermine a finding of probable cause. Thus, we conclude that the District Court correctly found that no reasonable jury could find facts that would lead to the conclusion that Wilson's "corrected" warrant lacked probable cause. Therefore, we do not have to reach the second prong of the qualified immunity investigation, that is, whether the right was clearly established.

In sum, we conclude that the District Court correctly concluded that Russo did not violate Wilson's constitutional right to be free of unlawful arrest. Therefore, we affirm the grant of summary judgment on qualified immunity grounds.

III. Continued Incarceration

Wilson contends that even if he was properly arrested in the first instance, he was kept in jail in violation of his rights because Russo learned of exculpatory facts after the arrest which should have motivated him to try to release Wilson. On February 7, Russo interviewed Wilson's friend

_____

9. The dissent notes that both Braverman and Druce described the robber in terms of his notable height, citing to Druce's several statements about how "very tall" the intruder was. However, while the report available to Russo stated that the robber wasbetween 6'3" and 6'5", there is no record evidence from which a jury could concludethat Braverman's and Druce's more detailed impressions were passed on to Russo.

18

George Richardson, who told Russo that Wilson had spent February 3 in his company. He told him that Wilson wore blue jeans, tan work boots, a beige sweatshirt and a brown jacket that day. He said that they had gone to the Towne Center, where Wilson went to get a lemonade at the pizza parlor while Richardson went to the bank. As evidence of his veracity, Richardson gave Russo a bank slip with 3:38 stamped on it. Russo testified that he visited the bank and looked at the films from the bank's surveillance camera to look for Richardson, but that he could not recall what he saw and could not recall if the employees remembered Richardson.10

Wilson contends that Russo's post-arrest interview with Richardson provided exculpatory information that dissipated probable cause, and that Russo had a constitutional duty to inform the prosecutor of the interview and attempt to get Wilson released. The law in this area is not entirely settled. Compare Brady v. Dill, 187 F.3d 104, 112 (1st Cir. 1999) (concluding that police officers generally have no duty to try to release suspects when exculpatory information comes into their possession after a lawful arrest), with id. at 117-125 (Pollak, J., concurring) (proposing a rule by which "[a]n affirmative duty to release arises . . . if an arresting or custodial officer ascertains beyond a reasonable doubt that the suspicion (probable cause) which forms the basis for the privilege of arrest is unfounded."). See also Sanders v. English, 950 F.2d 1152, 1162 (5th Cir. 1992) ("[F]ailure to disclose . . . undeniably credible and patently exculpatory evidence to the prosecuting attorney's office plainly exposes[defendant police officer] to liability under S 1983."); BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986) ("The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause.").

We do not, today, need to decide these difficult issues.
_____

10. Russo also eventually interviewed the woman who had been in the flower shop on a bridal order. When shown the same photo array that Russo showed Braverman and Druce, she identified Wilson as the man who had been in the shop with her.

19

Regardless of the existence and scope of an officer's duty to seek to release a suspect when probable cause no longer exists, or the level of knowledge that he or she must have in order to trigger that duty, the interview with Richardson clearly did not dispel the earlier probable cause. 11 A friend of Wilson gave Wilson a partial alibi, and his description of Wilson's clothing did not match the victims' descriptions, but he placed Wilson in the vicinity at the time of the robbery, and nothing he said overwhelmed the fact of Braverman's positive identification. In short, no reasonable jury could conclude that this evidence dispelled probable cause.

For the foregoing reasons, the grant of summary judgment will be affirmed as to the federal claims. The case will be remanded to the District Court for consideration of the state claims.

_____

11. We also reject Wilson's suggestion that he has a due process claim because Russo should have done a better job of post-arrest investigation. As the Supreme Court stated in Baker v. McCollan , 443 U.S. 137, 145–146 (1979):

[W]e do not think a sheriff executing an arrest warrant is required
by the Constitution to investigate independently every claim of
innocence, whether the claim is based on mistaken identity or a
defense such as lack of requisite intent. Nor is the official charged
with maintaining custody of the accused named in the warrant
required by the Constitution to perform an error-free investigation of
such a claim.

GARTH, Circuit Judge, concurring:

I agree that the District Court's decision granting summary judgment to the defendants must be affirmed.[1] I write separately, however, because I take issue with the majority opinion's equivocal "probable cause" analysis as it relates to eyewitness identification. See Majority Op., Part II-B.

Despite recognizing the argument "that a positive identification by a victim is sufficient by itself to establish probable cause that the identified party was the offender," id. at 15, the majority opinion insists upon adopting a "weighing" principle that forces us to weigh "exculpatory" facts against "inculpatory" facts. See id. at 17-18. By doing so, the majority has misinterpreted and placed much emphasis on the reliability factor that the Supreme Court has held to be a necessary part of our Fourth Amendment analysis, see Illinois v. Gates, 462 U.S. 213, 230 (1983).

In probable cause analysis, it is the reliability of the witness (or victim) who has provided an identification of the assailant that is the focal point of the inquiry. It is not the reliability of the evidence provided in tandem with that individual's identification, which may be inconsistent with such an identification. As a result, the majority confuses a lack of reliability in an eyewitness with evidence that, at most, tends to exculpate the identified individual of wrongdoing and therefore simply is inconsistent with the victim's identification. Inconsistent or contradictory evidence may cut against a putative defendant's guilt at trial, but it cannot render invalid -- i.e., eliminate the probable cause necessary to obtain an arrest warrant-- a positive identification by an eyewitness who either a police officer or magistrate deemed to be reliable.

Reliability in this context obviously means an eyewitness who is neither mentally impaired or delusional. See Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988) (stating that as long as the identifying victim eyewitness is
_____

1. I further agree that because the District Court failed to address Wilson's state law claims, a remand is appropriate for this limited purpose.

21

"lucid," probable cause exists to arrest the identified individual). For instance, if the victim eyewitness were to show signs of insanity or other forms of mental instability, the reliability of that eyewitness would, in my view, justifiably be called into question. Statements during the identification process such as "That's the assailant! I'd know Abe Lincoln anywhere!" or "I believe that this is the thief, because he had three heads!" would signal such reliability concerns. Thus, it is the witness's reliability that is at the core of our probable cause determination, not the reliability of the individual's identification, as required by the majority opinion's formula, which weighs exculpatory against inculpatory evidence. Majority Op., at 17–18. Accordingly, I part company with the majority opinion at the point where the majority seeks to distort the probable cause analysis to the point of virtually requiring trial–type proof at the very threshold stage of criminal investigation.[2]

My thesis is simple and in accord with the prevailing jurisprudence. Once law enforcement officers have obtained a positive identification from a reliable witness, then, without more, probable cause exists to justify the arrest of the identified individual. As the Seventh Circuit has stated, "once a putative victim . . . has positively identified her attacker to the police and they have no reason to disbelieve her, the officers `need not take any additional steps to corroborate the information regarding the crime before taking action.' " Tangwall v. Stuckey, 135 F.3d 510, 516 (7th Cir. 1988) (quoting United States v. Decoteau, 932 F.2d 1205, 1207 (7th Cir. 1991)); see also Jones, 856 F.2d at 994.

Decisions from both this circuit and our sister circuits validate my interpretation of this interplay between the Fourth Amendment's probable cause requirement and victim eyewitness identifications, especially as they impact on the facts presented in this case. See Sharrar v. Felsing, 128 F.3d 810 (3d Cir. 1997); Tangwell v. Stuckey , 135 F.3d 510 (3d Cir. 1998); Lallemand v. University of Rhode Island,

_____

2. As the Supreme Court has stated, the standard for "probable cause does not demand the certainty we associate with formal trials." Illinois v.
Gates, 462 U.S. 213, 246 (1983).

22

9 F.3d 214 (3d Cir. 1993); Greene v. City of Philadelphia, No. CIV. A. 97-4264, 1998 WL 254062 (E.D. Pa. May 8, 1998).

Specifically, in Sharrar v. Felsing, 128 F.3d 810 (3d Cir. 1997), a woman telephoned 911 to report that she had been assaulted. See id. at 814. When the 911 operator asked the woman to identify the individual who had committed the assault, she immediately responded with the name Robert Carroll. See id. Once the police arrived, however, the woman had altered her story, and now alleged that her husband -- David Brigden -- was the assailant. See id. The police arrested Brigden, but after all charges against him had been dismissed, Bridgen brought a section 1983 action against the police, alleging that they lacked the probable cause to arrest him. See id. at 816-17. In particular, Brigden argued that his wife's earlier identification of Carroll as her attacker so impaired her reliability as to abrogate any finding of probable cause. See id. at 818.

We soundly rejected this argument, holding that law enforcement officers (or, presumably, a magistrate) need not carefully scrutinize an identification or other information provided by a victim of an alleged offense as they would with other informants. See id. at 818 (quoting Easton v. City of Boulder, 776 F.2d 1441, 1449 (10th Cir. 1985)). Most importantly, however, the Sharrar panel held that "[w]hen a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause." Id. (citing Torchinsky v. Siwinski, 942 F.2d 257, 262 (4th Cir. 1991); Grimm v. Churchill, 932 F.2d 674, 675 (7th Cir. 1991)); see also Greene v. City of Philadelphia, No. CIV. A. 97-4264, 1998 WL 254062, at *7 (E.D. Pa. May 8, 1998) ("The principle that probable cause may be based on a single and reasonably reliable eyewitness identification, even though the identification may be tarnished by discrepancies in the witnesses' description of the perpetrator, is well-established."). By affirming the district court's finding of probable cause to arrest Brigden, the panel in Sharrar implicitly stated that a victim's proffer of two different identifications for his or her attacker by name does not undermine the eyewitness's

23

reliability enough to eliminate probable cause to arrest. Any reading of the Sharrar opinion has to lead to the conclusion that it is the reliability of the eyewitness that is relevant and essential to the probable cause analysis, not the weighing process through which the majority attempts to modify our jurisprudence.[3]

Sharrar's application to the present matter is striking. Within a matter of hours, the alleged victim in Sharrar provided the police with two different names for her assailant. Even in the face of this blatant inconsistency, the Sharrar court -- our court -- held that the purported victim's positive identification was sufficient to give rise to probable cause.

To the contrary, the inconsistencies presented here are much less extreme. The only evidence that arguably can be considered inconsistent with Braverman's photo identification of Wilson was her earlier description of the assailant's height and Druce's inability to identify the assailant when presented with the same photo array. Merely providing a height range that is inconsistent with that of the individual identified does much less to question an eyewitness' reliability than does providing two different names of two different individuals within a span of hours. As such, any reading of our decision in Sharrar -- to which this panel is, of course, bound -- must lead to the conclusion that Braverman's identification of Wilson, without more, was sufficient to give rise to probable cause.

Even more persuasive, and nearly identical on a factual level, however, is Lallemand v. University of Rhode Island, 9 F.3d 214 (1st Cir. 1993). In Lallemand, a university student alleged that she had been raped, and during a medical exam, stated that her assailant was a fraternity pledge named "Dan," who was around six feet tall with blond hair. See id. at 214-15. During the ensuing police

_____

3. The majority cites the Eighth Circuit's opinion in Kuehl v. Burtis, 173 F.3d 646 (8th Cir. 1999), as support for this weighing process. The facts in Kuehl, however, do not concern eyewitness identification, and as such, render Kuehl completely inapplicable to the issue of the sufficiency of an eyewitness identification -- the probable cause determination presented in the instant case.

24

investigation, law enforcement officers showed the student photographs of each of the pledges from the fraternity at which the student claimed to have been assaulted. See id. at 215. Faced with these photos, the student "positively and without hesitation" identified, as her assailant, an individual named "David," who stood 6'7", and did not have blond hair. Id. at 215 & n.1. Notwithstanding these discrepancies, the First Circuit held that probable cause existed for "David's" arrest. See id. at 216-17. Indeed, the Lallemand court went so far as to state that"[t]he discrepancies concerning the assailant's first name, hair style, dormitory and height are trivial, given their nature and the positive identification." Id. at 217 (emphasis added); see also Tangwall, 135 F.3d at 516 ("The identification itself establishes probable cause to make an arrest, even where other witnesses' descriptions of the alleged perpetrator differ from the physical appearance of the individual so identified.").

Given the factual similarities presented between Lallemand and the instant matter, and our own court's acceptance -- in Sharrar -- of the constitutional premise underlying the First Circuit's persuasive holding in Lallemand, the equivocal and therefore improper and erroneous nature of the majority's probable cause analysis becomes clear.

In all other respects, however, I concur in the majority's analysis and its ultimate result.

25

POLLAK, District Judge, concurring in part and dissenting in part

I agree with virtually all of the opinion of the court. With respect to the legal standards announced by the court, I join the court's opinion without reservation. Where I part company with the opinion is in the court's application of its correct summary judgment standard to the facts in this case. In my view, the question whether the " `corrected' warrant" application (i.e., the warrant application as it would have been, had it been amended to cure officer Russo's omissions and misstatement) established probable cause for Wilson's arrest is one that should be reserved for the finder of fact.[1]

A.

In a portion of the opinion of the court with which I do not take issue, the court determines that "[a]ny reasonable person would know that the significant height differential, and the fact that an eye-witness did not identify Wilson, were the kind of things the judge would wish to know." Supra p. 11–12 (quotation omitted). The court is surely correct in this conclusion. Like Braverman, Druce had ample opportunity to view the robber in the store, so his failure to identify the robber in the lineup is undoubtedly a significant fact. Braverman's and Druce's descriptions of the robber's height are at least as significant for these purposes. Braverman described the robber as "very tall" and estimated his height as between 6'2" and 6'4". Druce also described the robber as "very tall," guessing his height to be "about 6'5" tall, maybe a little bit taller." Indeed, the statements of Braverman and Druce reveal that they were very attentive to the robber's height. Druce, for instance, stated that while the robber was not someone he had seen before, "it would be someone I'd remember because of the height of him, he's very tall that's the first thing I said to Renee, `He's tall, he's very tall.' "

_____

1. I agree with the court that summary judgment was properly granted in favor of officer Woroniecki for the reasons discussed by the court, supra p. 3–4 note 1.

26

For purposes of identification of a suspect, the significance of the difference in height between Wilson and the man described by Druce and Braverman may be even greater than is suggested by the court's statement that Wilson was "four to seven inches shorter" than the robber described in the police report. Supra p. 18. Both Druce and Braverman were quite clear that they viewed the robber as an exceptionally tall man. And while estimates of height may well be off by a few inches in either direction, it would be remarkable if someone who had had nearly an hour to observe a person of average height--as Wilson is--would describe that person as being exceptionally tall. And, of course, it would be that much more remarkable if two such observers made the same mistake. Thus, the height discrepancy was clearly a fact that a reasonable officer would expect a judge to want to know. It follows that knowingly omitting such information in the context of a warrant application would amount to reckless disregard for the truth, as the court has concluded. Similarly, the fact that Druce failed to identify Wilson was information that a judicial officer would be expected to want to know. And, finally, I agree with the court that Russo's statement to the judge about the timing of DaVila's seeing Wilson in the parking lot constituted reckless disregard for the truth.

The court follows these conclusions with a discussion of the materiality of the omissions and misstatement, concluding that the omissions and misstatement were not material in the face of Braverman's positive identification. Indeed, the court concludes that "no reasonable jury could find facts that would lead to the conclusion that Wilson's `corrected' warrant lacked probable cause." Supra p. 18.

That statement contains an implicit recognition of the fact that, in the Third Circuit, it is well established that "the existence of probable cause in a section 1983 action is a question of fact." Sherwood v. Mulvihill , 113 F.3d 396, 401 (3d Cir. 1997); see also Groman v. Township of Manalapan, 47 F.3d 628, 635 (3d Cir. 1995) (reversing summary judgment as to issue of probable cause); Deary v. Three Un-Named Police Officers, 746 F.2d 185 (3d Cir. 1984) (same); Patzig v. O'Neill, 577 F.2d 841 (1978) (holding that the existence of probable cause in civil cases is "a question for the jury").

27

Judge Garth, in his concurrence, argues that a positive identification by an eyewitness deemed reliable by the police or the judicial officer issuing the warrant is conclusive--as a matter of law--on the question of probable cause without regard for any extrinsic evidence that may cast doubt on the accuracy of that identification. The court rejects Judge Garth's submission. While it is undeniable that a positive identification is very strong evidence in support of a finding of probable cause--a finding that, as Judge Garth correctly notes, is properly made on far less evidence than that needed to establish guilt--the court's rejection of a per se rule is surely correct. For, as the court's hypothetical illustrations demonstrate, there may well be cases in which the exculpatory evidence is so overwhelming as to outweigh the inculpatory effect of a positive identification, even for purposes of a showing of probable cause.

It is not my view that the exculpatory evidence is so strong in this case as to require, as a matter of law, the conclusion that a judicial officer to whom the"corrected" warrant application was submitted could not have found probable cause. It is my view, however, that the present case is within the class of cases--a class that is likely to be a limited one where a positive identification has been obtained--in which a factfinder might reasonably conclude that a judicial officer assessing the "corrected" warrant application would not have found probable cause. I say this for the following reasons.

The court acknowledges that Braverman's identification "should be viewed with some skepticism because her identification of Wilson was inherently incompatible with her description of the robber." Supra p. 17. While the court does not undertake to quantify the level of skepticism the court would apply, it appears that the level is not very high, for Braverman's weakened identification, coupled with DaVila's observation of Wilson in the vicinity, is still viewed by the court as sufficient to support the conclusion that a reasonable finder of fact would be required to conclude that a judicial officer would have found probable cause, notwithstanding other strongly exculpatory evidence: namely, Druce's description of Wilson and his failure to

28

identify Wilson as the robber, and the fact that Wilson was seen in the parking lot at a time when the robber was in the flower shop. By contrast, it seems to me well within the range of plausibility that a judicial officer assessing the "corrected" warrant application, (1) might have viewed Braverman's identification with very considerable skepticism; (2) might have largely or entirely discounted DaVila's statement, given that the time at which DaVila said she saw Wilson in the parking lot was the very time at which the robber was in Braverman's flower shop; and (3) might have credited the other exculpatory evidence quite highly. If so, the judicial officer might reasonably have concluded that probable cause had not been established. "But the weight that a neutral magistrate would likely have given such information is a question for the finder of fact." Velardi v. Walsh, 40 F.3d 569 (2d Cir. 1994). Accordingly, so it seems to me, the District Court's grant of summary judgment on the question of probable cause was inappropriate.

That it would be reasonable to conclude that Russo had not established probable cause is strongly supported by the court's conclusion that any reasonable person would view the omitted information as information that a judicial officer would want to know—a conclusion that, as I have discussed, is quite proper given the significance of that information in the context of the present case. A judicial officer would be expected to want to know this information largely because such information at least had the potential to make a difference in the determination of the existence of probable cause. It is thus puzzling that the court appears to conclude both (1) that it would be unreasonable to keep the information from the judge, which would seem to suggest that it could make a difference to a probable cause inquiry, and (2) that it would be unreasonable to conclude that the information would have made a difference to probable cause. It appears that the court views the information as potentially significant in thefirst context, but necessarily insignificant in the second. For the reasons discussed above, I agree with the court that the information omitted and misstated by Russo was of substantial significance. And, for essentially the same reasons, I also believe that a factfinder could find that, had it been

29

supplied, the omitted and misstated information would have had a determinative effect on the issue of probable cause, even in the face of a positive identification.[2]

B.

In the previous section, I stated my agreement with the court that Russo's misstatement and omissions were in reckless disregard for the truth. But I have concluded, in disagreement with the court, that a factfinder could find that, but for the misstatement and omissions, a judicial officer would not have issued an arrest warrant, from which it follows that Russo's conduct could be found by a factfinder to have deprived Wilson of a constitutional right. The right not to be arrested on the basis of a warrant obtained on the basis of a law enforcement officer's representations or omissions made in reckless disregard of the truth is a clearly established right. See Lippay v. Christos, 996 F.2d 1490, 1504 (3d Cir. 1993) ("If a police officer submits an affidavit containing statements he knows to be false or would know are false if he had not recklessly disregarded the truth, the officer obviously failed to observe a right that was clearly established. Thus, he is not entitled to qualified immunity.").

_____

2. A fortiori, I also disagree with the court's conclusion, in section III of
the court's opinion, that no reasonable factfinder could have found that
the additional exculpatory evidence gathered by Russo subsequent to
Wilson's arrest undermined probable cause. (As the court's opinion
notes, see supra p. 19, I have had occasion, in Brady v. Dill, 187 F.3d
104, 123 (1st Cir. 1999) (concurring), to address the further question,
which the court in the present case identifies but does not undertake to
resolve, whether an officer who acquires evidence which incontestably
establishes the innocence of a person he holds in custody is
constitutionally obligated to release that person without seeking judicial
intervention. In Brady, I was sitting as a member of a First Circuit
panel,
and my affirmative answer to the question was rejected by the panel
majority. In my view, application to the present record of either the
standard I endorsed in Brady, or that adopted by the Brady majority,
would preclude recovery on this basis. Accordingly, I do not differ with
the ultimate conclusion reached by the court; that is, that summary
judgment is appropriately affirmed with respect to plaintiff 's claim
discussed in section III of the court's opinion.)

30

Accordingly, I would reverse the entry of summary judgment in favor of Russo, and remand the case for further proceedings.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit