**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3029
_____

RADDY N. TORIBIO,
                              Appellant

v.

BERNARD SPECE; MICHAEL SADUSKY;
BERNARD WALASAVAGE
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 3-10-cv-02441)
District Judge: Honorable Malachy E. Mannion
_____

Submitted Under Third Circuit LAR 34.1(a)
January 17, 2014
_____

Before: RENDELL, ROTH and BARRY, Circuit Judges

(Filed: February 21, 2014)
_____

OPINION
_____

BARRY, Circuit Judge

Raddy Toribio was arrested for a string of bank robberies he did not commit, and

was released three days later. He filed an action pursuant to 42 U.S.C. § 1983 alleging

false arrest, false imprisonment and malicious prosecution against three members of the

Pennsylvania State Police. The District Court granted defendants' motion for summary judgment, finding that they had probable cause for the arrest, promptly effected Toribio's release upon discovering exculpatory evidence, did not act with malice, and were in any event entitled to qualified immunity. Toribio appealed. We will affirm.

## I. Background

On August 6, 2010, a man robbed the Susquehanna Bank in Schuylkill County, Pennsylvania, the latest in a series of bank robberies in central Pennsylvania. Three bank employees offered descriptions of the robber. Teller Deborah Steffee, who, in response to the robber's note, handed him money, said he was six foot to six foot three inches tall with a goatee; another teller, Tara Pandher, who "had a glimpse of" the robber but "did not see his face," described his apparel and said he had a "fine lined beard" (181a); and branch manager Christy Rebehn, who saw the robber dash through the parking lot from her office window, described him as a "darker skinned not black male about" six foot tall (168a).

Investigators publicly disseminated a grainy, low quality photo taken by the bank's surveillance camera. The image showed the robber standing with his arms crossed leaning against a wall. Although it provided a three-quarters view of the robber's face, the facial features appeared somewhat blurred, and a black baseball cap obscured the shape of his head and forehead.

Nonetheless, the photo immediately produced a tip. Cassandra Shoaff, Toribio's ex-girlfriend and the mother of his five-year old son, told a friend in the Allentown Police

2

Department that she believed Toribio was the man in the photo. That information made its way to Corporal Michael Sadusky, who was heading the investigation. When Sadusky called Shoaff, she told him that "her son saw the photo of the defendant on the internet" and said "'that's daddy.'" (132a). Sadusky gave hard copies of the photo and other images captured by the surveillance camera to the Allentown Police Department, which, in turn, forwarded them to Shoaff. Shoaff claimed to be "95% sure that the male in the pictures" was Toribio, but could not "be 100% certain . . . due to the quality of the pictures." Id.

To corroborate Shoaff's identification, Trooper Bernard Walasavage arranged a photo lineup using an array of head shots of Toribio and seven other Hispanic men. Walasavage asked Steffee, Pandher and Rebehn to participate, even though Pandher and Rebehn had already told investigators that they had not gotten a good look at the robber.

Before conducting the lineup, Walasavage showed each of the women photos of the robber from surveillance footage at Susquehanna Bank and several previously targeted banks. At the lineup itself, Pandher, who had not seen the robber's face, claimed to be certain that the head shot of Toribio depicted the robber. Rebehn stated that she "only saw [the robber] from the side and with his head down" and declined to identify anyone. (132a). Steffee, however, the teller to whom the robber passed the note, confidently identified Toribio.

Satisfied that they had the right man, Trooper Bernard Spece applied for an arrest warrant. The supporting affidavit described Shoaff as a "source who wished to remain

3

anonymous." (188a). It made no mention of her relationship to Toribio. With respect to the photo lineup, the affidavit stated that both Pandher and Steffee positively identified Toribio, but made no mention of Pandher's statement that she never saw the robber's face, nor of Walasavage's peculiar procedure of asking the participants to look at surveillance photos before proceeding to the lineup.

A warrant issued, and Toribio was arrested on August 10, 2010. At five foot nine, Toribio was several inches shorter than certain witnesses had described. Concerned with the discrepancy, Sadusky called Steffee and Rebehn, "advised both that [he] had located the individual that was identified in the photo lineup," and asked them to confirm the identification by viewing him through a one-way glass window at the police station. (133a). Upon seeing Toribio, Steffee "hugged [Sadusky] in elation" and "related that she had no reservations that [Toribio] was the man who robbed the bank." Id. Rebehn, too, said she was sure Toribio was the robber, despite having previously declined to identify him in the photo lineup.

Two days later, another bank was robbed in Lancaster County. Sadusky learned of the robbery the next day, and Toribio was released. All charges were dropped two business days after the Lancaster robbery occurred.

Toribio filed an action under § 1983 against Spece, and later a separate action against Sadusky and Walasavage. The two cases were consolidated, and Toribio filed amended complaints alleging one count of false arrest, one count of false imprisonment, and one count of malicious prosecution. Defendants' motion for summary judgment was

4

granted on June 4, 2012, and this timely appeal followed.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343, and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review of an order granting summary judgment. See Giles v. Kearney, 571 F.3d 318, 322 (3d Cir. 2009). "A court may grant summary judgment only when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. (internal quotation marks omitted). "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," but the "mere existence of some evidence in support of the non-movant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." Id. (internal quotation marks omitted).

## III. Analysis

### A. False Arrest

"[A] plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." Wilson v. Russo, 212 F.3d 781, 787 (3d Cir. 2000). "To determine the materiality of the misstatements and omissions, we excise the offending inaccuracies and insert the facts

5

recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." Id. at 789 (internal quotation marks and citation omitted).

"Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." Id. "[T]he evidentiary standard for probable cause is significantly lower than the standard which is required for conviction" and "does not depend on whether the suspect actually committed any crime." Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005). "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." Hill v. California, 401 U.S. 797, 804, 91 S. Ct. 1106, 1111 (1971).

Toribio identifies four misleading statements that he believes created a material falsehood in the application for his arrest warrant: (1) it described Shoaff as an "anonymous source" when in fact she was known to Sadusky as Toribio's ex-girlfriend and the mother of his child; (2) it did not mention that Shoaff expressed some doubt in her identification of Toribio because of the low quality of the surveillance photos; (3) it did not describe flaws in the lineup procedure; and (4) it did not mention that Toribio was three to six inches shorter than the robber had been described.[1]

Had the affidavit been as forthcoming as Toribio claims it should have been, the facts set forth would have nonetheless established probable cause. For one thing, even if there was some reason to question Shoaff's motives, a description of her close

---

[1] It is unclear from the record whether any of the officers knew Toribio's height before the warrant was issued.

relationship with Toribio would have indicated that she was better able than most people to recognize him from surveillance photos. To be sure, the images were of poor quality and lacking in detail, but Shoaff was still "95%" certain that it was him. And even if we discount Pandher's belated identification of Toribio as having been the result of Walasavage's display of surveillance photos prior to the lineup, Steffee's identification remained of significant value given that she engaged in a direct and extended interaction with the robber at her teller's window just half a day earlier.

Thus, a more exhaustive warrant application would have described a near-certain identification, based on surveillance photos, from a person who knew Toribio very well, and a certain identification from the photo array by an eyewitness who got an excellent, and recent, look at him. The only evidence going the other way was some discrepancy in height. The evidence was more than sufficient to establish a "fair probability that [Toribio] committed the crime at issue," a standard which, of course, leaves ample room for a mistaken identification. Wilson, 212 F.3d at 789 (internal quotation marks omitted).

**B. False Imprisonment**

Toribio argues that "once Corporal Sadusky saw [Toribio]," he should have "realized that they had the wrong man" and released him, rather than conducting a one-on-one show-up to confirm the identification. Appellant's Br. at 33. That claim appears to be based on the discrepancy in height between Toribio and the witness descriptions of the robber that only became apparent to Sadusky upon viewing Toribio in custody.

The "existence and scope of an officer's duty to seek to release a suspect" after a

lawful arrest is unsettled in this Court.  Wilson, 212 F.3d at 792.  In the First Circuit, no duty exists, because "once probable cause has been established, a warrant issued, and an arrest perfected, the ordinary course is for the prosecutor to decide whether to go forward, and if he elects to proceed, for the judicial branch to make the final ascertainment of guilt or innocence—not for the police to take matters into their own hands."  Brady v. Dill, 187 F.3d 104, 112 (1st Cir. 1999).  In the Fifth Circuit, officers are required to disclose "undeniably credible and patently exculpatory evidence to the prosecuting attorney's office."  Sanders v. English, 950 F.2d 1152, 1162 (5th Cir. 1992).

We need not settle the unsettled issue.  When Sadusky first became aware that Toribio was shorter than the descriptions of the robber with which he had been provided, Toribio had been arrested on a warrant, was in the custody of Pennsylvania State Police, and there were positive identifications by Steffee and Shoaff.  Any difference in height was surely not "patently exculpatory."

Toribio also argues that "there was no . . . rush to get him out of jail and out from under the criminal law procedure" after the defendants learned about the Lancaster robbery.  Appellant's Br. at 33.  When the defendants learned of that robbery, however, Toribio was no longer in their custody but had been remanded to the Schuylkill County Prison.  Thus, the only possible obligation of the defendants in that situation would have been to promptly disclose the information to someone who could apply for Toribio's release.  They did just that.

8

**C. Malicious Prosecution**

To succeed on a claim for malicious prosecution, a plaintiff must prove that the proceeding against him was "was initiated without probable cause." DiBella v. Borough of Beachwood, 407 F.3d 599, 601 (3d Cir. 2005). As discussed above, there was ample probable cause for Toribio's arrest.

## IV. Conclusion

The order of the District Court will be affirmed. [2]

---

[2] Given this disposition, we need not reach the issue of whether defendants were entitled to qualified immunity.