**James ARMSTEAD, Plaintiff,**

v.

**TOWNSHIP OF UPPER DUBLIN, et al., Defendants.**

**No. Civ.A. 03–CV–3608.**

United States District Court, E.D. Pennsylvania.

Nov. 23, 2004.

---

190

Timothy M. Kolman, Ari Risson Karpf, Timothy M. Kolman and Associates, Langhorne, PA, for Plaintiff.

Joseph J. Santarone, Jr., Marshall, Dennehey, Warner, Coleman & Goggin, Norristown, PA, for Defendants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

### I. Introduction

Plaintiff James Armstead ("Armstead" or "plaintiff") brings this action under 42 U.S.C. § 1983 alleging that Upper Dublin Township Police Officer Michael B. Lebby ("Officer Lebby"), the Upper Dublin Township Police Department ("Police Department"), and the Township of Upper Dublin ("Upper Dublin") violated Armstead's rights secured by the Fourth and Fourteenth Amendments to the United States Constitution. In particular, Armstead alleges that Lebby arrested him outside of Lebby's jurisdiction, without probable cause, and through the use of excessive force. Further, Armstead alleges that Upper Dublin failed to train its police officers not to arrest individuals in such a fashion. The defendants have filed a motion for summary judgment. For the reasons that follow, I will grant their motion in part and deny it in part.

### II. Statement of Facts [1]

The allegations in this case stem primarily from Armstead's arrest on January 7, 2003; however, Armstead's history with the Police Department and Officer Lebby begins some time before that day. Armstead lived at all relevant times at 119 Chelsea Avenue in the North Hills community of Abington Township, Pennsylvania. (Pl.'s Mem. Opp. Summ. J. Ex. A at 7.) Before his death, Paul Armstead, Jr., plaintiff's father, in addition to owning the

---

[1.] All inferences drawn from the underlying facts are viewed in the light most favorable to plaintiff, the non-moving party, and his allegations are taken as true when supported by proper proofs whenever those allegations conflict with those of the defendants. *See Kopec v. Tate,* 361 F.3d 772, 775 (3d Cir.2004).

property at 119 Chelsea, owned property across the street at 130 Chelsea Avenue. However, this property was within the boundaries of Upper Dublin, Pennsylvania. (*Id.* at 55.) At the time of his death, the exact date of which is unclear from the facts in the record, Paul Armstead owned four old cars that he had planned to repair. He kept them on the lot at 130 Chelsea Ave. (*Id.* at 55–57.)

At some point following Paul Armstead's death, and possibly before, Upper Dublin began to send citations for unregistered vehicles addressed to Paul Armstead at 119 Chelsea Ave. (*Id.* at 61.) As a general practice, however, plaintiff merely set the letters aside unopened. (*Id.* at 62.) Plaintiff's brother one day opened some of the letters and discerned that their late father was being cited for his abandoned vehicles. (*Id.* at 8, 63.) Plaintiff's brother called Upper Dublin and informed them that Paul Armstead was deceased and that plaintiff resided at 119 Chelsea. (*Id.* at 63–64.) From that point forward, Upper Dublin mailed citations addressed to plaintiff.

Plaintiff's brother, sister and plaintiff himself all called Upper Dublin at later dates to explain that the cars were property of their father's estate. (*Id.* at 67–69.) Upper Dublin informed them that it needed to send citations to somebody and would send them to whomever lived at 119 Chelsea. (*Id.* at 67–70.) The citations requested payment of $353. (*Id.* at 71.) At least one of the notices sent to plaintiff explained that the unpaid citations now amounted to a warrant for plaintiff's arrest and that plaintiff would be arrested unless plaintiff paid the amount due or contacted the district court. (*Id.*) Plaintiff called Upper Dublin, but not the district court, to explain that he was not the owner of the vehicles that were the subject of the citation. (*Id.* at 72.)

Sometime around April 2002, an Abington police officer stopped plaintiff's vehicle while plaintiff was driving in Upper Dublin because plaintiff's vehicle had dealer license plates. (*Id.* at 10–14.) Noticing that there was an outstanding warrant for plaintiff's arrest in Upper Dublin, the Abington police arrested plaintiff and eventually turned him over to the Upper Dublin authorities. (*Id.* at 18–19.) An Upper Dublin official took plaintiff to the Upper Dublin police station, where plaintiff was held overnight. (*Id.* at 19.) At some time during his detention, plaintiff, distraught over what he felt was his unjust arrest, attempted to commit suicide by hanging himself. (*Id.* at 20–22.) A police officer intervened. (*Id.* at 21.)

The following day, plaintiff was brought before Montgomery County District Judge Patricia Zaffarano. (*Id.* at 11–12.) On plaintiff's assertion that the vehicles were not his property, Judge Zaffarano released plaintiff on his own recognizance, warning him that she would reissue a warrant if she discovered that plaintiff did own the property and the cars. (*Id.* at 12.)

Following his release, plaintiff was driven home by Officer Lebby. (Def.'s Mot. Summ. J. Ex. B at 12.) The two acted cordially towards one another and plaintiff returned home without event. (*Id.*)

Roughly seven months later, on January 7, 2003, Judge Zaffarano issued a second arrest warrant based on the outstanding vehicle citations. (Def.'s Mot. Summ. J. Ex. C.) The warrant indicated that the plaintiff was charged with having more than one unregistered vehicle on his property. (*Id.*) It was a "fine and cost" warrant, which means that the subject of the warrant has the option of either paying the outstanding fine directly to the executing officer or being arrested and brought before the issuing judge. (*Id.*, Def.'s Mot. Summ. J. Ex. B at 9.) Officer Lebby was

assigned the task of executing the warrant, though he did not play any role in its issuance. (Def.'s Mot. Summ. J. at 9, 16, 21.)

Sometime during the morning of January 7, 2003, early enough such that it was still dark outside, Officer Lebby arrived at 119 Chelsea to execute the warrant. (*Id.* at 27.) 119 Chelsea is outside of Officer Lebby's primary jurisdiction and he did not follow usual police procedures to obtain permission from Abington Township to make the arrest. (*Id.* at 14–15.) Upon his arrival, Officer Lebby knocked on the front door and was let in by plaintiff's nephew. (Def.'s Mot. Summ. J. Ex. B at 30–32.) After Officer Lebby explained that he had a warrant for plaintiff's arrest, plaintiff's nephew showed Officer Lebby to plaintiff's bedroom upstairs. (*Id.* at 32–34.)

Armstead was laying on the bed, possibly watching television or possibly sleeping, when Officer Lebby opened the door to Armstead's bedroom without knocking. (Pl.'s Mem. Opp. Summ. J. Ex. A at 77–81, 83.) Armstead was wearing a T-shirt and nothing else. (*Id.* at 80.) Officer Lebby announced that he had a warrant for Armstead's arrest. (*Id.* at 81.) Armstead asked what he was being arrested for and Officer Lebby explained that it was for the outstanding citations on the vehicles and that Armstead would need to come with him. (*Id.* at 82, 84.) When Armstead attempted to retrieve paperwork showing he was not the owner of the cars in question, Officer Lebby grabbed him from behind and refused to let him retrieve the paperwork. (Def.'s Mot. Summ. J. Ex. B at 41.) Officer Lebby never informed Armstead that he could pay the fine and avoid being arrested. (Pl.'s Mem. Opp. Summ. J. Ex. A at 113.)

Armstead asked for an opportunity to put clothes on and went to put on a pair of pants that were laying on the floor. (*Id.* at 84.) Officer Lebby said to Armstead, "I told you you got to come with me. What, are you resisting arrest?" (*Id.* at 86.) Armstead responded, "No, I'm trying to get my pants on." (*Id.*) Armstead had managed to get his pants around his ankles when Officer Lebby pushed Armstead on the back, threw him onto the bed, pinned him down, and handcuffed him. (*Id.* at 84–87.) The handcuffs were applied extremely tightly and pinched Armstead's forearms. (*Id.* at 106.) While this was happening, Armstead pleaded that he was only trying to put his pants on. (*Id.* at 89.) All the while, Armstead was very cooperative with Officer Lebby. (*Id.* at 115.)

Officer Lebby then dragged Armstead downstairs,[2] outside in cold and rainy weather, and to the police vehicle, with Armstead's pants still around his ankles. (*Id.* at 51, 92–96; Def.'s Mot. Summ. J. Ex. B at 27.) Other than his pants at his ankles, Armstead wore only a T-shirt and was not wearing shoes or underwear. (Pl.'s Mem. Opp. Summ. J. Ex. A at 91, 97.) Armstead continued to try to pull his pants up on his way to the police vehicle. (*Id.* at 97.) Once in the car, he finally managed to pull his pants up. (*Id.* at 98.) Armstead noticed in the car that the handcuffs had caused his wrists to bleed. (*Id.* at 106.) Armstead complained repeatedly that the handcuffs were too tight, but does not recall informing Officer Lebby or any other officer that his wrists were bleeding. (*Id.* at 107.)

After a fifteen minute ride to the police station, Armstead was placed in a cell. (*Id.* at 101.) Armstead's wrists stopped bleeding on their own within ten minutes

---

**2.** Armstead uses the term "dragged," however it is clear that he was on his feet for the duration of his exit from his home. (*Id.* at 90–94.)

of his arrival at the station. (*Id.* at 109.) Within a half hour of his arrival he was offered blankets and additional clothing, which he refused because he felt humiliated. (*Id.* at 111–12.) A police captain suggested that Armstead file a complaint based on his poor treatment. (*Id.* at 121–22.)

Armstead was brought before Judge Zaffarano, who recognized him from the original warrant. (*Id.* at 128.) After speaking with Armstead's attorney over the phone, Judge Zaffarano released Armstead. (*Id.*)

Armstead suffered no physical injuries from his treatment, except the abrasions to his wrist caused by the tight handcuffs. (*Id.* at 134.) Armstead also claims emotional injuries based on "being outside and humiliated with no clothes on ... with [his] naked privates showing, neighbors looking...." (*Id.*)

## III. Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(c), "[s]ummary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham,* 120 F.3d 392, 395 (3d Cir.1997).

## IV. Discussion

To recover under 42 U.S.C. § 1983, Armstead must establish that a state actor engaged in conduct that deprived him of "rights, privileges, or immunities" secured by the constitution or laws of the United States. *Wilson v. Russo,* 212 F.3d 781, 786 (3d Cir.2000). Furthermore, "law enforcement officers acting within their professional capacity are generally immune from trial 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.*

The qualified immunity defense involves a multi-step analysis. First, a court must "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Id.* Only if he has alleged such a deprivation should a court "proceed to determine whether that right was clearly established at the time of the alleged violation." *Id.* "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Carswell v. Borough of Homestead,* 381 F.3d 235, 242 (3d Cir.2004) (quotations omitted). Even if a reasonable official would so understand, the defendant may still be shielded from liability if he "made a reasonable mistake as to what the law requires." *Id.*

"[Q]ualified immunity is an objective question to be decided by the court as a matter of law. The jury, however, determines disputed historical facts material to the qualified immunity question." *Id.* (citation omitted).[3] Summary judgment is appropriate if no reasonable juror could conclude that the plaintiff's clearly established rights were violated. *Wilson,* 212 F.3d at 786. Methodologically, a court may "arrange the facts in the light most favorable to the plaintiff, ... determine whether, given precedent, those 'facts,' if true, would constitute a deprivation of a

---

**3.** District courts may use special interrogatories to allow juries to perform this function. The court, however, must make the ultimate determination on the availability of qualified immunity as a matter of law. *Id.*

right[,] [a]nd then, if necessary, determine if the right is clearly established." *Id.*

## A. Arrest Outside Jurisdiction

■ Plaintiff alleges that his "Fourth Amendment rights to be free from an unlawful search and seizure" were violated when Officer Lebby arrested plaintiff outside of his primary jurisdiction and in apparent violation of Pennsylvania's Municipal Police Jurisdiction Act, 42 Pa.C.S.A. § 8953. (Pl.'s R. Mem. Opp. Summ. J. at 4.) However, the Fourth Amendment is not implicated simply because an individual acting under color of state law violates state law. *See Baker v. McCollan,* 443 U.S. 137, 144, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Carter v. Bartle,* 1990 WL 156543 (E.D.Pa.1990) (complaint alleging arrest outside primary jurisdiction failed to allege a constitutional claim unless arrest was without probable cause). "[S]ection 1983 ... merely provides a remedy for deprivations of rights established elsewhere in the *Constitution or federal* laws." *Estate of Smith v. Marasco,* 318 F.3d 497, 505 (3d Cir.2003) (emphasis added). Plaintiff has not alleged a violation of a federal right and, in this respect, his section 1983 claim must fail.

## B. Arrest Without Probable Cause

■ Plaintiff argues that he was arrested without probable cause and therefore deprived of liberty in violation of the Fourth and Fourteenth Amendments. However, the Constitution "protects only against deprivations of liberty accomplished 'without due process of law.' A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers ... is entirely consistent with 'due process of law.'" *Baker,* 443 U.S. at 145, 99 S.Ct. 2689. An officer executing a warrant need not "investigate independently every claim of innocence." *Id.* at 146, 99 S.Ct. 2689.

It is undisputed that Officer Lebby was executing a facially valid warrant. Plaintiff has not put forward any evidence questioning the sufficiency of the affidavit supporting probable cause. In fact, plaintiff does not appear to argue that the warrant was issued without probable cause at all. Rather, plaintiff alleges that Officer Lebby executed the warrant without probable cause, despite the existence of a valid warrant supported by probable cause, because he in fact knew that plaintiff did not own the vehicles in question. Plaintiff's only evidence to support his allegation is: 1) the fact that plaintiff had been previously arrested and at least temporarily convinced a judge that he was not responsible for the vehicles; 2) the fact that Officer Lebby drove plaintiff home following the first arrest and had a vague recollection of the encounter; and 3) the fact that Armstead "completely believe[s]" that Officer Lebby and the Police Department were aware that Armstead did not own the vehicles. "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination." *United States v. Leon,* 468 U.S. 897, 921, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Even assuming that an executing officer's happenstance familiarity with the facts underlying an arrest warrant could serve to defeat a prior judicial determination of probable cause, plaintiff's allegations are insufficient to support a determination that Officer Lebby, relying on such an arrest warrant supported by probable cause, nevertheless did not have probable cause to arrest Armstead. Therefore, plaintiff has not established a constitutional violation and in this respect his section 1983 claim also fails.

## C. Extraordinary Manner of Arrest

### 1. Constitutional Standard

■ When a police officer uses excessive force in the course of making an ar-

rest, he violates the arrestee's Fourth Amendment right to be free from "unreasonable" seizures of the person. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). As a general matter, where probable cause exists, a seizure of the person is deemed reasonable. *Whren v. United States*, 517 U.S. 806, 817, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). However, "seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests" may be unreasonable under the Fourth Amendment. *Id.* at 818, 116 S.Ct. 1769. Claims of excessive force are simply one subset of this larger, but still narrow, category of Fourth Amendment claims. *Id.* The test of the reasonableness of such seizures under the Fourth Amendment "is whether, under the totality of the circumstances, 'the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.' " *Estate of Smith v. Marasco*, 318 F.3d 497, 515 (3d Cir.2003) (citing *Graham*, 490 U.S. at 397, 109 S.Ct. 1865). In the context of the use of force, the factors that a court should consider include: 1) the severity of the crime at issue; 2) whether the suspect poses an immediate threat to the safety of the officers or others; 3) whether he is actively resisting arrest or attempting to evade arrest by flight; 4) the possibility that the persons subject to the police action are violent or dangerous; 5) the duration of the action; 6) whether the action takes place in the context of effecting an arrest; 7) the possibility that the suspect may be armed; and 8) the number of persons with whom the officers must contend at one time. *Id.*

In the instant case, Armstead characterizes his claim against Officer Lebby as one based on the officer's use of excessive force. However, because Officer Leb-by's alleged conduct involves both violence and humiliation, plaintiff's claim is perhaps more properly characterized generally as a claim that Officer Lebby seized Armstead in an extraordinary manner, unusually harmful to both Armstead's privacy and physical interests, as suggested in *Whren*. 517 U.S. at 818, 116 S.Ct. 1769. Armstead has put forth evidence from which a reasonable jury could conclude that Officer Lebby, in the context of executing an arrest warrant for unregistered vehicles, threw Armstead down on the bed half-naked, handcuffed him so tightly that his wrists bled, refused to loosen the handcuffs despite Armstead's repeated complaints, hurried him downstairs without affording him an opportunity to cover himself, and then marched him outside of his home, essentially naked from the waist down, in the cold rain, to the patrol car. Furthermore, a reasonable jury could conclude that Armstead was cooperative with Officer Lebby and that Officer Lebby never informed Armstead that he could simply pay the outstanding $353 fine and avoid arrest.

In reviewing the factors described above, it is clear, when the facts are looked at in the light most favorable to the plaintiff, that the factors weigh heavily towards objective unreasonableness. There is, at the very least, a genuine dispute over the following issues of fact: 1) Armstead's crime was extremely minor and wholly lacking in violence; 2) Armstead did not pose an immediate threat to safety; 3) Armstead was not resisting arrest or attempting to flee; 4) Officer Lebby had no indication that Armstead was violent or dangerous and, in fact, in their only previous encounter the two had behaved cordially towards each other; 5) there was no indication that Armstead was armed; and 6) Officer Lebby was contending with only one individual. The only undisputed factors not weighing in favor of unreasonable-

ness are that: 1) the duration of the action was not noteworthy; and 2) the action took place in the context of effecting an arrest. Under these facts, it cannot be said that Officer Lebby's violent and humiliating treatment of Armstead was objectively reasonable under the circumstances. Therefore, plaintiff has alleged and provided evidentiary support for a claim of constitutional violation.

### 2. Qualified Immunity

Because plaintiff has established a constitutional violation, I must now consider whether Officer Lebby should nevertheless be shielded from liability because his actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Carswell,* 381 F.3d at 242.

In *Kopec v. Tate,* 361 F.3d 772, 775 (3d Cir.2004), the Third Circuit ruled that a police officer, arresting an individual on February 2, 2000, nearly three years prior to the arrest in the instant case, violated a clearly established constitutional right when he applied excessively tight handcuffs and failed to respond to the arrestee's repeated requests for them to be loosened, resulting in permanent nerve damage. 361 F.3d at 777. The court noted that the United States Supreme Court had held as early as 1985 that "the Fourth Amendment governs not only whether a person or thing is subject to a 'seizure,' but also 'the manner in which a . . . seizure is conducted.'" *Id.* at 777–78 (citing *Palmer v. Sanderson,* 9 F.3d 1433, 1436 (9th Cir. 1993) and *Tennessee v. Garner,* 471 U.S. 1, 7–8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). The *Kopec* court held that there was a clearly established "right to be free from the use of excessive force in the course of handcuffing." 361 F.3d at 778.

The instant case differs somewhat factually from *Kopec* and the cases on which the *Kopec* court relied in evaluating whether that right was clearly established. For example, in the instant case, Armstead's physical injuries were minor relative to the injuries inflicted in *Kopec,* while the circumstances facing Officer Lebby were even more benign than the circumstances facing the officer in *Kopec,* and Armstead's harsh treatment contained an element of humiliation not present in *Kopec.*[4] However, "there does not have to be a precise factual correspondence between the case at issue and a previous case in order for a right to be clearly established." *Id.* (quotations omitted). And while there do not appear to be many cases specifically requiring officers to afford arrestees an opportunity to clothe themselves before removing them from their homes, I have little trouble determining that under all of the circumstances of this case, viewed, of course, in the light most favorable to the plaintiff, that an individual's right to be free from unreasonable seizures involving excessively tight handcuffs and forcible removal from one's home naked from the waist down, was clearly established on January 7, 2003. Furthermore, a reasonable officer would have understood that his actions violated that clearly established right and Officer Lebby could not have made a reasonable mistake as to what the law requires. Therefore, the set of disputed facts that precludes summary judgment on grounds of qualified immunity is coextensive with the set of facts giving rise to the constitutional violation. Those factual

---

**4.** *Kopec* was decided well after the events in question in this case, thus the facts of the case are not relevant in and of themselves as to whether a reasonable officer would have recognized that the treatment of Armstead violated a clearly established right. *Kopec* is relevant because the Third Circuit held that the conduct at issue in that case violated a right that was clearly established as of February 2000, well before Armstead's arrest.

issues are:[5] 1) whether Officer Lebby threw Armstead down on the bed half-naked and handcuffed him so tightly that his wrists bled; 2) whether Officer Lebby refused to loosen the handcuffs despite Armstead's repeated complaints; 3) whether Officer Lebby hurried Armstead, who was essentially naked from the waist down, downstairs and outside to the patrol car in the cold rain, without affording him an opportunity to cover himself; 6) whether Officer Lebby did not inform Armstead that he could simply pay the outstanding $353 fine and avoid arrest; 7) whether Armstead's underlying crime was minor and wholly lacking in violence; 8) whether Armstead did not pose an immediate threat to safety; 9) whether Armstead did not resist arrest or attempt to flee; 10) whether Officer Lebby did not have reason to believe that Armstead was violent or dangerous; 11) whether Officer Lebby did not have reason to believe that Armstead was armed; and 12) whether Officer Lebby was contending with only one individual. As the reasonableness of Officer Lebby's conduct must be considered under the totality of the circumstances, all of these facts are potentially material.

### D. Failure to Train

■ "A municipality cannot be responsible for damages under section 1983 on a vicarious liability theory, and can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *Carswell,* 381 F.3d at 244 (citation omitted). "A plaintiff must identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom the police come into contact." *Id.* With respect to Officer

Lebby's unconstitutional seizure, plaintiff's only remaining viable claim of constitutional violation, plaintiff alleges that Upper Dublin failed to train its officers in the appropriate use of force. However, there is no evidence in the record even pertaining to a Township policy or custom, nor has plaintiff addressed this issue in its briefs. Therefore, I must dismiss plaintiff's claim against Upper Dublin.

### V. Conclusion

For the reasons described above, defendants' motion for summary judgment is granted with respect to plaintiff's claim of arrest outside defendants' primary jurisdiction, arrest without probable cause, and failure to train. Defendants' motion is denied with respect to plaintiff's claim of unreasonable seizure through the use of excessive force and extraordinary means.

**AND NOW,** this 29th day of November 2004, upon consideration of defendants Upper Dublin Township, Upper Dublin Police Department, and Michael B. Lebby's motion for summary judgment (Docket # 15) and plaintiff's responses, it is hereby **OR-DERED** that the said motion is **GRANTED IN PART** and **DENIED IN PART**, as indicated in the accompanying memorandum.

---

**5.** Some of these issues are undisputed, but in the *plaintiff's* favor. I list all of the issues here as they are material to the question whether there has been a constitutional violation unprotected by qualified immunity. *See*

*Forbes v. Township of Lower Merion,* 313 F.3d 144, 146 (3d Cir.2002) (requiring District Courts to "specify those material facts that are and are not subject to genuine dispute and explain their materiality").