**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2898
_____

RONALD SAINTIL,
                              Appellant

v.

BOROUGH OF CARTERET; BOROUGH OF CARTERET POLICE DEPARTMENT;
TOWNSHIP OF HAMILTON; TOWNSHIP OF HAMILTON POLICE
DEPARTMENT; BOROUGH OF CARTERET POLICE CHIEF JOHN PIECZYSKI;
CARTERET POLICE DET. THOMAS OCONNOR; CARTERET DET. LT. ROBERT
WARGOCKI; HAMILTON TWP. POLICE CHIEF JAMES W. COLLINS;
HAMILTON TWP. POLICE SGT. KYLE THORNTON; HAMILTON TWP. SGT.
TERRY KING; HAMILTON TWP. P.O. CHRISTOPHER DIMEO; HAMILTON TWP.
P.O. JONATHAN WOODHEAD; HAMILTON TWP. P.O. CHRISTOPHER
SCHUSTER; HAMILTON TWP. P.O. DAVID DE LEON; HAMILTON TWP. P.O.
CHESTER EMBLEY; HAMILTON TWP. P.O. DAVID H. LEONARD; HAMILTON
TWP. P.O. MARK HORAN; HAMILTON TWP. P.O. PATRICK R. GUIDO;
HAMILTON TWP. P.O. JAMES M. STEVENS; HAMILTON TWP. P.O. SEAN B.
MATTIS; HAMILTON TWP. P.O. LEONARD J. GADSBY; HAMILTON TWP. P.O.
WILLIAM P. MURPHY; HAMILTON TWP. DET. LT. JOSEPH MASTROPOLO;
MIDDLESEX COUNTY PROSECUTOR INVEST. SGT. JAMES NAPP; MIDDLESEX
COUNTY PROSECUTOR DET. GREGORY MORRIS; MIDDLESEX COUNTY
PROSECUTOR INVEST. SGT. SCOTT CROCCO; MIDDLESEX COUNTY
PROSECUTORS OFFICE; DETECTIVES JOHN DOES 1-10; BOROUGH OF
CARTERET POLICE OFFICERS 1-10; HAMILTON TWP. POLICE OFFICERS JOHN
DOES 1-10
_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 3-17-cv-00433)
U.S. District Judge:  Honorable Freda L. Wolfson
_____

Before: SHWARTZ, CHUNG, and AMBRO, <u>Circuit Judges</u>.

(Filed: July 29, 2024)
_____

OPINION[*]
_____

CHUNG, <u>Circuit Judge</u>.

Ronald Saintil appeals the District Court's order granting summary judgment to Defendants on his federal and state law claims that arose from his arrest and the search of his property. For the following reasons, we will affirm in part and reverse in part.

## I.     Background

On the morning of January 30, 2015, Adison Trigueno called the Borough of Carteret (New Jersey) Police Department ("CPD") to report that he found his boss, Anthony Mocci, unconscious. When police arrived, they found Mocci dead from bludgeoning to the head. CPD contacted the Middlesex County Prosecutor's Office ("MCPO") and a homicide investigation ensued.

The police, including MCPO Sergeant Scott Crocco and CPD Detective Thomas O'Connor, conducted numerous interviews that day. Trigueno told O'Connor and another officer that: (1) several of Mocci's past employees, including Saintil, believed Mocci owed them money, and (2) "quite a while ago" Mocci had a dispute with Saintil

---

[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

and, at some unstated time, Mocci said that Saintil showed up to Mocci's home about the dispute and Mocci "had to tell [Saintil] if he comes back to my house or if he shows up to my house, he's going to leave in a bag[.]" App. 266. A tenant in the apartment complex told police that she saw Mocci's truck parked in front of her apartment the night before Mocci's murder and that, for about two minutes, a black SUV with all tinted windows idled in the middle of the street near Mocci's vehicle. Police also interviewed Mocci's wife and a friend, neither of whom mentioned Saintil. Based on these interviews, police initially identified several persons of interest, including Saintil.

That evening, police drove to Saintil's residence in unmarked vehicles, without their emergency lights activated.[1] Police parked across the street from the residence and observed Saintil's black SUV parked outside. Crocco saw a person he believed to be Saintil in the front window.[2] Plain-clothed officers could see the lights were on in Saintil's apartment and knocked on the front exterior door,[3] which led to a common hallway. Two plain-clothed officers, including O'Connor, went to the rear of the building. When Saintil heard voices outside, he went to the back bedroom and separated a portion of the window shade to look outside. O'Connor was positioned in the rear of the building and reported seeing an individual matching Saintil's general description who

---

[1]    Below we note where the parties' accounts differ.

[2]    Saintil asserts that Crocco incorrectly claimed to have seen him through a second-story window at the front of the residence. The record reflects that Crocco stated he observed Saintil through a window without specifying the floor.

[3]    Saintil concedes that he heard the knock.

3

looked poised to climb out of the window. Saintil denies that he ever attempted to exit through the window and states that, once he saw the armed, plainclothes officers, he became frightened and retreated into his apartment. The parties agree that at some point—either after the police knocked (police account) or after Saintil looked out the back window (Saintil's account)—Saintil turned the apartment lights off. Around this time, an officer placed a phone call to Saintil's cell phone, but it went unanswered. The police reported that they could hear the phone ringing within. While Saintil disputes that it would have been possible to hear his cell phone ringing, he does not dispute that he did not answer the calls.

Crocco then telephonically applied for, and a state court judge issued, a search warrant for Saintil's home and car, and an arrest warrant for hindering his own apprehension under N.J. Stat. Ann. § 2C:29-3b(2) ("hindering by force").[4] In setting forth facts to support probable cause for the warrants, Crocco relied upon his own observations and facts communicated to him by O'Connor. After the warrants were authorized, Hamilton Township's SWAT team and other officers forcibly entered the premises. The officers announced themselves with their weapons drawn, handcuffed Saintil, and then lowered their weapons. Police seized Saintil's vehicle, driver's license,

---

[4]     Saintil was ultimately charged with another hindering offense ("hindering by destruction") under N.J. Stat. Ann. § 2C:29-3b(1), not § 2C:29-3b(2). A person commits hindering by force "if with the purpose to hinder his own apprehension, prosecution, conviction or punishment," he "[p]revents or obstructs by means of force or intimidation anyone from performing an act which might aid in his discovery or apprehension, or in the lodging of a charge against him." N.J. Stat. Ann. § 2C:29-3b(2).

4

cell phone, and computer, and arrested[5] and transported him to the police station. Saintil was charged later that night with violating N.J. Stat. Ann. § 2C:29-3b(1), hindering by destruction.[6] Bail was set at $100,000, principally because Saintil was a "prime suspect" in a homicide investigation. App. 306. Saintil was released ten days later and the hindering charge was ultimately dismissed.

Saintil sued various law enforcement officers who were active at the scene or ensuing arrest, as well as their affiliated agencies for unlawful search and seizure, excessive force, false arrest and imprisonment, and malicious prosecution, all in violation of 42 U.S.C § 1983 and the Fourth Amendment (Counts 1, 2, 3, and 4, respectively), and in violation of the New Jersey State Constitution, the New Jersey Civil Rights Act ("NJCRA"), and the New Jersey Tort Claims Act ("NJTCA") (Counts 8, 9, 10, and 11). He also brought claims for vicarious liability (Count 18) and joint and several liability (Count 19), and sought punitive damages (Count 17) and attorneys' fees and costs under 42 U.S.C. § 1988 and the NJCRA (Count 20).[7] The District Court granted summary judgment in favor of Defendants on all counts. *Saintil v. Borough of Carteret*, Civ. No.

---

[5]    While the record does not clearly state this, Saintil appears to have been arrested on the arrest warrant issued by phone and no party argues otherwise.

[6]    Unlike hindering by force, hindering by destruction does not require force or intimidation and instead is committed when a person "[s]uppresses, by way of concealment or destruction, any evidence of the crime or tampers with a document or other source of information, regardless of its admissibility in evidence, which might aid in his discovery or apprehension or in the lodging of a charge against him[.]"  N.J. Stat. Ann. § 2C:29-3b(1).

[7]    Saintil filed a letter informing the District Court that he did not oppose summary judgment as to claims not addressed herein.

17-433, 2022 WL 4289035, at \*1 (D.N.J. Sept. 16, 2022).  Saintil now appeals.[8]

## II.  Legal Standard and Analysis[9]

"To recover under 42 U.S.C. § 1983, [a plaintiff] must establish that a state actor engaged in conduct that deprived him of 'rights, privileges, or immunities' secured by the constitution or laws of the United States."  *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000) (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996)).  Claims brought under the NJCRA are interpreted analogously to the corresponding Section 1983 claims.  *See Hedges v. Musco*, 204 F.3d 109, 120 n.12 (3d Cir. 2000).

---

[8]     Saintil declined to oppose summary judgment as to certain defendants before the District Court**,** and failed to name others in his notice of appeal, leaving: Sgt. Scott Crocco and Sgt. James Napp of the MCPO ("MCPO Defendants"); Det. Thomas O'Connor of the CPD; and Sgt. Terry King and Officers Jonathan Woodhead, Christopher Schuster, Chester Embley, Mark Horan, William P. Murphy, James M. Stevens, Sean B. Mattis, and Leonard J. Gadsby, as well as the Township of Hamilton ("Hamilton Defendants").  *See Carter v. Rafferty*, 826 F.2d 1299, 1304 (3d Cir. 1987)  To the extent Saintil now raises arguments as to some of the defendants named in the notice of appeal but whose motions he did not oppose, including Joseph Mastropolo and Gregory Morris, those arguments are forfeited absent exceptional circumstances, which Saintil has not shown.  *See In re Bestwall LLC*, 47 F.4th 233, 242 & n.11 (3d Cir. 2022) (citing *United States v. Olano*, 507 U.S. 725, 733 (1993), *Simko v. U.S. Steel Corp.*, 992 F.3d 198, 205 (3d Cir. 2021)).

[9]     The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.  We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review de novo a district court's order granting summary judgment.  *Andrews v. Scuilli*, 853 F.3d 690, 696 (3d Cir. 2017).  Summary judgment is appropriate where, drawing all reasonable inferences in favor of the nonmovant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 415 (3d Cir. 2011) (quotation marks and citation omitted).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 289 (3d Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

6

A.     Fourth Amendment Claims Asserting Probable Cause Based on False
       Statements or Omissions

We first address Saintil's Fourth Amendment claims.  "Where the alleged Fourth

Amendment violation involves a search or seizure pursuant to a warrant, the fact that a

neutral magistrate has issued a warrant is the clearest indication that the officers acted in

an objectively reasonable manner." *Messerschmidt v. Millender*, 565 U.S. 535, 546

(2012) (citing *United States v. Leon*, 468 U.S. 897, 922-23 (1984)).  But in cases like this

one, where a plaintiff claims that the warrant application was supported by incomplete or

false information, the plaintiff can state a claim upon showing that: (1) the officer

"knowingly and deliberately, or with a reckless disregard for the truth, made false

statements or omissions that create[d] a falsehood in applying for a warrant," and

(2) those assertions or omissions were "material, or necessary, to the finding of probable

cause." *Wilson*, 212 F.3d at 786-87 (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399

(3d Cir. 1997)).  This same framework applies whether a plaintiff alleges that a search

warrant or arrest warrant lacked probable cause.  *Id.* (false arrest); *Sherwood*, 113 F.3d

396 (unlawful search).

"An assertion is made with reckless disregard when 'viewing all the evidence, the

affiant must have entertained serious doubts as to the truth of his statements or had

obvious reasons to doubt the accuracy of the information he reported.'"  *Wilson*, 212 F.3d

at 788 (quoting *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1995)).

"[O]missions are made with reckless disregard for the truth when an officer recklessly

omits facts that any reasonable person would know that a judge would want to know."

7

*Id.* at 783.  To assess the materiality of an officer's purportedly false assertions or reckless omissions, the reviewing court prepares a reconstructed affidavit that corrects the misleading assertions and includes omitted evidence.  *Id.* at 789.  We "then determine whether or not the 'corrected' warrant affidavit would establish probable cause."  *Id.*  If so, then the statements were not material and summary judgment was appropriately granted.  *Id.*

> 1. Knowingly, or with Reckless Disregard for the Truth, Made False Statements or Omissions

In this case, Saintil alleges that Crocco fabricated and bolstered witness identifications implicating him in Mocci's homicide and that O'Connor falsely reported that Saintil tried to flee from the police, which statement Crocco then relied upon in the warrant application.  In particular, Saintil alleges that the affidavit did not support a finding of probable cause because it suffered from the following inaccuracies, false statements, or omissions, among others:

(1) Trigueno stated that Mocci had "an ongoing dispute with an individual by the name of Ronald [Saintil]," Saintil had been fired two months ago, Saintil showed up at Mocci's home "in the last several weeks," and "a verbal argument ensued where death threats were made by both parties toward each other."[10]  App. 301-02.  According to the transcript of Trigueno's interview, he stated that the dispute took place "quite a while ago" and there is no evidence in the record indicating that the two ever exchanged death threats.  App. 266.

(2) Mocci's wife identified Saintil as a possible suspect and said he had been fired two months prior to the incident.  There is no evidence in the record showing that Mrs. Mocci mentioned Saintil to the police.

---

[10]  Although Crocco did not participate in the formal interviews of Trigueno or Mocci's neighbor, it is apparent from the affidavit's contents that he relied upon the interview in swearing out the warrants.  While O'Connor and another officer interviewed Trigueno, Saintil only sues O'Connor.

8

(3) Ron Ozechowski, another worker and Mocci's close friend, "confirmed of an ongoing dispute with the victim and this Mr. Ronald Saintil and confirmed that [Saintil] drove a black vehicle." App. 302. There is no indication that Ozechowski mentioned Saintil or an ongoing dispute between Saintil and Mocci.

(4) After police arrived at Saintil's residence and knocked on the door, all the lights in the house went out. Two officers went around the back where they saw Saintil attempting to climb out of a window with the screen pushed out. Saintil disputes both assertions. He claims that the back window remained shut, he never tried to escape, and he only turned off the lights after seeing O'Connor with his gun drawn out the back window.

(5) Saintil's vehicle matched the description of a vehicle that Mocci's neighbor observed parked behind Mocci's car for several minutes. In fact, the neighbor stated that the car idled for about two minutes in the middle of the road and the record reflects that Saintil's vehicle was only a partial match—the neighbor stated that the vehicle's windows were "all tinted" and that she thought it was a police car, whereas only the rear windows of Saintil's SUV were tinted. App. 281.

A reasonable jury could find that Crocco acted knowingly or with a reckless disregard for the truth when reciting the basis for the arrest and search warrants over the phone because his testimony directly contradicts the witness statements on which it was based and omits details about Saintil's vehicle "that a judge would want to know." *See Wilson*, 212 F.3d at 783. A reasonable jury could also credit Saintil's account that he never tried to escape out the back window and thus could find that O'Connor demonstrated a "willingness to affirmatively distort truth" by either relaying false information or fabricating the escape attempt with the intent that it be included in the warrant application. *See id.* On the other hand—at least with respect to statements not based on his personal knowledge—a reasonable jury could find that Crocco was provided erroneous information from others and that he neither knew he was making false

9

statements nor made them with a reckless disregard the truth. A reasonable jury could also credit O'Connor's account that he saw Saintil attempt to flee. These factual findings and credibility determinations are best made by a jury, and thus a genuine dispute of material fact exists as to Saintil's false arrest and unlawful search claims.

Saintil also claims false imprisonment, alleging that he was wrongfully held following his initial arrest on the hindering by force charge and pursuant to the complaint filing the hindering by destruction charge. Saintil was not held on the hindering by force charge, however; he was held pursuant to the later-filed hindering by destruction charge. Saintil does not allege that the complaint charging him with that offense contained any false statements.[11] Without such an allegation, Saintil's claim fails at the first step of our analysis because there is no genuine dispute that Crocco or O'Connor knowingly, or with a reckless disregard for the truth, made false statements in the complaint.[12] *See Messerschmidt*, 565 U.S. at 547. We will thus affirm the grant of summary judgment on Saintil's false imprisonment claim.

2.      Materiality of Allegedly False Statements and Omissions

We next consider whether the errors in Crocco's testimony and O'Connor's reporting were "material, or necessary, to the finding of probable cause" by striking the

---

[11]      The probable-cause affidavit that O'Connor submitted with the complaint charging Saintil states, "The facts and circumstances, which I believe establish probable cause that the suspect was seen in his apartment by officers. The suspect then retreated into his residence and refused to answer his door to his residence or answer his phone. Both were tried numerous times."

[12]      Saintil does not argue that the District Court erred by dismissing the false arrest and false imprisonment claims as against the remaining appellees.

misstatements from the probable cause affidavit and adding in the omissions. *Wilson*, 212 F.3d at 789. We prepare a reconstructed affidavit that corrects the misleading assertions and includes omitted evidence. *Id.* *See* Appendix A (panel's reconstructed affidavit). If the reconstructed affidavit still supports probable cause, then the allegedly false statements and omissions were not material and summary judgment was properly granted. *Id.* On the other hand, if a reasonable jury could find that this reconstructed affidavit does not support probable cause to believe that evidence of Mocci's murder would be found within Saintil's home or car, or probable cause to believe that Saintil was hindering his own apprehension in violation of N.J. Stat. Ann. § 2C:29-3b(1) or (2), then summary judgment is not appropriate. *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016). We will address materiality as to each claim in turn.

a.      Unreasonable Search and Seizure

Drawing all reasonable inferences in favor of Saintil on his unlawful search claim, as we must at the summary judgment stage, we conclude that he has created a genuine dispute of fact as to the materiality of the alleged false statements and omissions. Specifically, we conclude that a reasonable jury could find the following facts: Saintil had an argument with Mocci quite a while ago and, at some unknown time, appeared at Mocci's home at which time Mocci threatened to kill Saintil. Quite a while after their dispute, Mocci was murdered by bludgeoning. A car similar to Saintil's idled outside the crime scene for approximately two minutes. No one left the vehicle or entered the home. When police later came to Saintil's home, Saintil looked out his back window, saw

11

unknown armed men in his yard, retreated into his home, refused to answer the door or phone, turned off the lights, and avoided engagement with the police.

A reasonable jury could further find that the dispute with Mocci was too remote in time to draw any inference against Saintil, that the facts did not sufficiently connect the vehicle to the murder or Saintil, and that Saintil did not attempt to flee from his rear window but rather feared for his life when he saw armed, plainclothes men around his home. A reasonable jury thus could find that the facts within the reconstructed affidavit do not support probable cause to believe that evidence of Mocci's murder would be found within Saintil's home or car.

Certainly, a reasonable jury could also find facts and draw inferences from the reconstructed affidavit against Santil and in favor of supporting probable cause. For instance, a reasonable jury could find there was reason to believe the Jeep was connected to the murder, though present only for a short time, as a means to confirm the victim was present inside; and that Saintil's refusal to answer the phone or door and turning off the lights reflected a consciousness of guilt and desire to evade detection.

Which facts should be found and which inferences should be drawn (including whether at step one above there were any knowing false or recklessly false statements or omissions) will largely turn on the credibility of the witnesses. Accordingly, there exists a genuine issue of material fact on the materiality of the allegedly false statements to the probable cause finding and omissions and the District Court's grant of summary judgment in favor of Crocco was inappropriate. *See Dempsey*, 834 F.3d at 468.

We reach the same conclusion as to O'Connor. It is undisputed that O'Connor was not involved in applying for the warrant, and likely was not aware of the alleged misrepresentations and omissions that Crocco made while testifying regarding the witness statements. However, a reasonable jury could find that the discrepancy between O'Connor's account and Saintil's regarding the events at the back window is material to the probable cause determination. Indeed, O'Connor testified that his belief that Saintil possessed evidence of the murder was based on "the totality of the circumstances," including "Mr. Saintil trying to climb out the back window, trying to leave the scene." We thus conclude that a genuine dispute exists that the alleged false statements were material to the probable cause finding as to O'Connor on the unlawful search claim.[13]

### b. False Arrest

To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish that: (1) there was an arrest; and (2) the arrest was made without probable cause. *See Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995); *Dowling v. City of*

---

[13] With respect to all appellees, Saintil also asserts that the warrant was defective because it did not satisfy the particularity requirement for both the place to be searched and items to be seized. As to the place to be searched, the state court issued the warrant to search a specific apartment at a particular location and a specific car bearing a specific license plate. As to the items to be seized, "the breadth of items to be searched [and seized] depends upon the particular factual context of each case and also the information available to the investigating agent that could limit the search at the time the warrant application" was made. *United States v. Yusuf*, 461 F.3d 374, 395 (3d Cir. 2006). Here, the nature of the crime, a homicide, was specified and the state court allowed the officers to search for evidence of that offense. Moreover, that the officers only seized his vehicle, computer, phone, and driver's license demonstrates that they understood the warrant's limited scope. For these reasons, the particularity argument fails and we affirm as to this issue.

13

*Phila.*, 855 F.2d 136, 141 (3d Cir. 1988). Because Saintil's false arrest claim is also based upon Crocco's and O'Connor's allegedly false statements and omissions, the same two-step framework applies for determining whether the officers acted unreasonably. Accordingly, we now address whether the alleged falsities and omissions were material to the probable cause determination for Saintil's arrest.

"Whether any particular set of facts suggest that an arrest is justified by probable cause requires an examination of the elements of the crime at issue." *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005). Police first arrested Saintil for hindering by force pursuant to the telephonic warrant, but later charged him with hindering by destruction. Because "an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking," *District of Columbia v. Wesby*, 583 U.S. 48, 54 n.2 (2018) (citation omitted), we will address probable cause as to both provisions of the statute.

A person may be charged with hindering by force if, among other things, he "[p]revents or obstructs [his apprehension] *by means of force or intimidation*." N.J. Stat. Ann. § 2C:29-3b(2) (emphasis added). In this case, the prosecutor recommended, and a judge authorized, Saintil's arrest pursuant to this provision. Although reliance on the advice of the prosecutor and issuing magistrate that an arrest is supported by probable cause is presumptively reasonable, here, a reasonable jury could find that a reasonable officer with basic knowledge of New Jersey's hindering statute would not have relied on that advice. *See Malley v. Briggs*, 475 U.S. 335, 345 (1986); *Kelly v. Borough of Carlisle*, 622 F.3d 248, 255 (3d Cir. 2010). Nothing in the reconstructed (or original)

14

affidavit or the circumstances that confronted the officers gave rise to a "fair probability" that Saintil sought to evade apprehension "by means of force or intimidation." N.J. Stat. Ann. § 2C:29-3b(2). *See Kelly*, 622 F.3d at 258 ("Police officers generally have a duty to know the basic elements of the laws they enforce.") (collecting cases).[14]

We now turn to whether the reconstructed affidavit supports probable cause for hindering by destruction. Hindering one's own apprehension or prosecution by destruction under § 2C:29-3b(1) requires, among other things, that a defendant suppressed evidence of a crime by concealment or destruction, knowing he might be charged with a crime. N.J. Stat. Ann. § 2C:29-3b(1). As we have explained, a reasonable jury could conclude that the evidence available to police did not give rise to a fair probability that Saintil was involved in, and therefore possessed evidence of, Mocci's homicide. Even assuming that a reasonable jury could conclude that Saintil's actions may have reflected a consciousness of guilt that he committed some kind of unnamed crime, construing all facts and inferences in the reconstructed affidavit in Saintil's favor, a reasonable jury could find that turning off the lights and refusing to answer the phone and door do not support an inference that evidence was being destroyed or concealed.

Because a reasonable jury could find that the reconstructed affidavit does not support probable cause for either hindering charge, we conclude that as to Saintil's false

---

[14]    Saintil and O'Connor dispute whether Saintil sought to escape through the back window of his home. Even if the act of fleeing through a window could give rise to a reasonable belief that the use of force or intimidation was imminent, we cannot make the credibility determination necessary to resolve this dispute at the summary judgment stage. *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004).

15

arrest charge, a genuine dispute exists whether the alleged misstatements and omissions were material. *See Dempsey*, 834 F.3d at 468.

B. <u>Malicious Prosecution</u>

In order to establish a prima facie claim for malicious prosecution under the Fourth Amendment, a plaintiff must establish both the forum state's common law tort elements and "some deprivation of liberty consistent with the concept of 'seizure.'" *Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998) (citation omitted); *see also Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993). In New Jersey, malicious prosecution arises when a person "recklessly institutes criminal proceedings without any reasonable basis[.]" *Lind v. Schmid*, 337 A.2d 365, 368 (N.J. 1975). A malicious prosecution claim thus requires evidence that:

> (1) the defendant[] initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendant[] acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005) (citation omitted).

As we have discussed above, a jury could find that that there was a lack of probable cause for the criminal proceedings that Crocco and O'Connor initiated against Saintil, and it is undisputed that the proceeding ended in Saintil's favor when he was

16

released from custody and the charges against him were dropped.[15]

With regard to malice, "malice is inferable from the finding that the defendant had neither probable cause for the criminal complaint nor a reasonable belief in probable cause." *Jobes v. Evangelista*, 849 A.2d 186, 194 (N.J. App. Div. 2004); *Lind*, 337 A.2d at 368; *Galafaro v. Kuenstler*, 147 A.2d 550, 554 (N.J. Super. App. Div. 1958); *Earl v. Winne*, 101 A.2d 535, 542 (N.J. 1953). Whether or not Crocco or O'Connor reasonably believed the statements contained within the affidavit, and whether they thus reasonably believed that probable cause existed will, like the causes of action discussed above, largely turn on credibility and the resolution of factual disputes, matters that should be determined by a jury. *Cf. Lind*, 368 A.2d at 370 (where a factual dispute exists, the question of probable cause should go to jury); *see, e.g.*, *Dalton v. Godfrey*, 117 A. 635, 637 (N.J. 1922) (affiant would not have reasonable belief probable cause existed if affiant knew facts contained in affidavit were false; affiant's knowledge was jury question). We will therefore reverse the District Court's dismissal of the malicious prosecution claim against Crocco and O'Connor. *Andrews*, 853 F.3d at 697.

C.    Excessive Force

Saintil's Fourth Amendment excessive force claim against the Hamilton

---

[15]    Crocco argues that this claim should fail because he did not play a role in the charging decision. This element is sufficiently pled, however, by the allegation that Crocco initiated the criminal action by submitting a probable cause affidavit for approval. *See Harvard v. Cesnalis*, 973 F.3d 190, 203 (3d Cir. 2020). Crocco also argues that he is entitled to absolute immunity as a "prosecutorial employee," Crocco Br. 26, but prosecutorial immunity does not extend to law enforcement officers carrying out law enforcement functions. *See Malley*, 475 U.S. at 342-44.

17

Defendants fails. To evaluate that claim, we examine the objective reasonableness of the officers' conduct. *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). This requires that we consider "whether under the totality of the circumstances, 'the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.'" *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting *Graham*, 490 U.S. at 397 (internal quotation marks omitted)).

Saintil asserts that the force used, the display of firearms (which lasted less than one minute) and handcuffing, was objectively unreasonable. *See Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) ("use of guns and handcuffs must be justified by the circumstances"). Applying the relevant factors[16] and viewing the facts in the light most favorable to Saintil, we conclude that there is no genuine dispute as to whether the force used here by the Hamilton Defendants was objectively unreasonable. The crime at issue—homicide—is serious. *Sharrar*, 128 F.3d at 822 (relevant factors include "severity of the crime at issue"). Given the nature of the crime, it was reasonable for officers to conclude that Saintil was possibly armed, "violent or dangerous," *id.*, and posed a threat

---

[16] The following factors guide our analysis: "(1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, . . . (3) whether the suspect attempts to resist arrest or flee the scene[,]" *Santini*, 795 F.3d at 417 (citing *Graham*, 490 U.S. at 396), (4) "the possibility that the persons subject to the police action are themselves violent or dangerous, [(5)] the duration of the action, [(6)] whether the action takes place in the context of effecting an arrest, [(7)] the possibility that the suspect may be armed, and [(8)] the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199, 209-11 (3d Cir. 2007).

18

to them.  The officers' entry was authorized by a warrant issued by a neutral magistrate and purportedly supported by probable cause.  They had also been told that Saintil was seen trying to escape out the back window.  As noted above, the record contains no evidence that the officers who executed the search warrant and took custody of Saintil had reason to know or suspect that the information provided to them was false or that the warrants were issued without probable cause.  *See Maryland v. Garrison*, 480 U.S. 79, 85 (1987).  The display of firearms was objectively reasonable because the SWAT team entered the premises of a person suspected of violently murdering his former boss, and the display lasted no longer than necessary as the SWAT team lowered their weapons after handcuffing Saintil.[17]  *Sharrar*, 128 F.3d at 822.  Although police had no indication that they might have to contend with more than one person, that factor alone is not dispositive and is outweighed by the other aforementioned factors indicating that the force used was objectively reasonable.  Accordingly, Saintil's excessive force claim fails.

## III.   Conclusion

For the foregoing reasons, we will reverse the District Court's grant of summary judgment on the unlawful search, false arrest, and malicious prosecution claims only as against Crocco and O'Connor.  On remand, the District Court should determine whether Crocco and O'Connor are entitled to qualified immunity.  We will affirm the remainder of the District Court's order.

---

[17]     *Cf. McNair v. Coffey*, 279 F.3d 463, 467 (7th Cir. 2002) (citing *Sharrar* for the proposition that "a simple display of force," such as "drawn guns . . . [that] giv[e] fright or offense," does not violate the Fourth Amendment where probable cause exists and where the force is reasonable).

19

APPENDIX A

Below is the reconstructed affidavit. The information Saintil asserts was materially false is reflected with the strike outs and the information he claims was material but omitted appears in italics.[1]

1) At approximately 8:22 a.m. this morning, Carteret Police Department responded to the residence of 76 Essex Street in Carteret.

2) At that location they discover a deceased male identified as Anthony Mocci. Mr. Mocci was found with severe head and body trauma at that location which is a house that he owns and is under renovation. At that point an investigation ensued.

3) We spoke with the co-worker or employee of Mr. Mocci, an individual by the name of Adison Trigueno. Mr. Trigueno stated that he was at the residence of 76 Essex Street last night at 7 p.m. with the victim. He left the victim at 76 Essex Street at 7 p.m. last night, he returned this morning at approximately 8:20 a.m. and that's when the victim was discovered.

4) A sworn statement was taken from Mr. Trigueno; during that statement he stated that the victim had, *quite a while ago, a* ~~an ongoing~~[2] dispute with an individual by the name of Ronald who had a heavy Haitian accent.

5) ~~That individual later identified through~~ the victim's wife ~~who~~ is a co-owner of the business.[3]

6) He was identified as Ronald [Saintil] who was an *ex*-employee of Mr. Mocci's, the victim. ~~Ronald Saintil fired 2 months ago, approximately 2 months ago by the~~

---

[1]     The testimony was transcribed without numbering the individual sentences. For convenience, we have numbered them. Where possible, we note the source of Saintil's assertions that are not based upon his statements alone.

[2]     The transcript to Trigueno's interview shows that he referred to the dispute as having occurred "quite [a] while ago." App. 266.

[3]     The MPCO Investigation Report does not include documentation that Lisa Mocci mentioned Saintil during the interview.

1

victim. ~~That is according to a sworn statement given by Mr. Trigueno and the victim's wife Lisa Mocci.~~[4]

7) *Quite a while ago,* there's ~~been an ongoing~~ a dispute with the victim. ~~and he (inaudible) in the last several weeks Mr. Ronald Saintil showed up at the victim's residence in Colonia, New Jersey and a verbal argument ensued where death threats were made by both parties toward each other.~~[5] ~~*, following which*~~ *Law enforcement officers learned from Trigueno that Saintil had shown up at Mocci's house and Mocci later relayed to Trigueno that he would kill Saintil if Saintil showed up at his house again.*

8) Adison Trigueno also stated that Mr. Saintil, Ronald Saintil drives a 1999 black Jeep Grand Cherokee.

9) We then took a sworn statement from another worker by the name of Ron Ozechowski who is known at this point to be the victim's best friend. ~~He confirmed an ongoing dispute with the victim and this Mr. Ronald Saintil and confirmed that he drove a black vehicle. Black SVU [sic].~~[6]

10) We then took a statement from the resident at 78 Essex Street right next door to where the victim was murdered. That individual's name was Jackie Cruz. During

---

[4]    Mrs. Mocci did not give a sworn statement and the record does not reflect that Mrs. Mocci or Trigueno told officers that Saintil was fired. Mrs. Mocci did provide officers with a list of Mr. Mocci's employees. Although police did eventually obtain business records indicating that Saintil had last worked for Mr. Mocci in November 2014, we do not see anything in the record that allows us to infer when they were given those records.

[5]    The transcript of Trigueno's interview shows that Trigueno did not describe the dispute as "ongoing," but rather having occurred "quite [a] while ago." App. 266. The statement about Saintil showing up at Mocci's house was first brought up by the questioning officer, Andrea Capraru, when she asked Trigueno who Trigueno had mentioned had shown up at Mocci's house, and Trigueno named Saintil. Upon careful review of the transcript itself, however, we see no earlier mention therein by Trigueno about Saintil showing up at Mocci's house. Similarly, we do not see any statement by Trigueno from the transcript about a verbal argument ensuing during Saintil's visit or any exchange of death threats.

[6]    The MPCO Investigation Report does not reflect Ozechowski mentioning Saintil.

2

the course of her statement she stated that approximately between 8:30 p.m. and 9 p.m. last night she observed a black SUV pull up ~~behind~~ *near* the victim's vehicle in front of 76 Essex Street and ~~park there for several~~ *idle in the middle of the road for approximately two minutes*. She described it as a black SUV with tinted windows and it appeared to be a Jeep Cherokee according to her. ~~She later saw the vehicle take off approximately several minutes later.~~ *Cruz stated that the SUV type vehicle she observed was "all tinted" and looked like a police car while Saintil's vehicle is tinted in the rear window and on the side, rear windows.*[7]

11) At that point, we developed leads that Ronald Saintil was a person of interest in this case.

12) The vehicle *partially* fit the description that was shown, showed up according to Ms. Cruz last night.

13) We confirmed through DMV that Mr. Ronald Saintil owns a 1999 black Jeep Grand Cherokee. We also we[re] able to determine that his residence is 58 Graddy Avenue, Apartment A. We were able to obtain that through DMV records ~~as well as his employment records with the company of Mr. Mocci~~.[8] We responded to that location 58 Graddy Avenue, Apartment A in Hamilton, New Jersey.

14) At approximately 7:25 p.m. this evening we pulled up at [Saintil's] residence, when we pulled up we observed an individual look out the front window.

15) All the lights were on in the residence.

16) When we pulled up the person looked out the front window, we walked up to that residence and knocked on the door. App. 303. *The door led to a common entry, not the actual door to Saintil's apartment.*

---

[7]    According to the transcript, Cruz stated that she thought the black SUV was "all tinted," and she thought it was a police car. A281. She stated that that car was in the middle of the road, idled, and stayed for "two minutes" before taking off. A281-82.

[8]    Saintil contends that officers did not have any employment records when the warrant application was made. We see evidence that the officers had time sheets from Mocci's business related to Saintil's employment, separate from the employee list they received from Mrs. Mocci, but we do not have information to infer whether or not the officers had these records before the warrant application.

17) At ~~that~~ *some* point all the lights in the house went out.[9] App. 303.

18) Two officers went to the back of the residence and we continued to knock in the front with no answer. At that point the *window shade* was pushed back ~~screen out of the window of that residence~~ and a black male was observed ~~attempting to come out that window. When the officers yelled at him he immediately slammed the window down and pulled down shade~~ *going* back inside that apartment.[10]

19) We were able to obtain a phone number for Mr. Saintil at which time we called that number. It's a cell phone. ~~We could hear a phone ringing inside the apartment.~~[11] There was no answer on that phone, we identified ourselves who we were and that we were outside the apartment and again no answer.

20) At this point we have maintained visual surveillance of all windows and doors in that apartment and we know there is a black male fitting the description of Ronald Saintil'*s race and gender* in that residence.[12]

21) The 1999 Jeep Grand Cherokee registered to Mr. Saintil was parked right in front of that residence and *partially* fits the description given by Ms. Cruz-as the vehicle that pulled up in front . . . of the crime scene last night.

---

[9]     Saintil testified at his deposition that he turned off the lights after he peered out the back window and saw the officers, and not after the officers knocked. Transcript of a telephone call from CPD to HPD requesting help and O'Connor's testimony indicate that "as the [officers were] approaching, [Saintil] shut the lights off," however, this call appears to have been made after Saintil was observed at the rear of the house. App. 294.

[10]     Saintil contends that his "bedroom window was, at all times, shut and locked" and that he "never attempted to open the window, no less attempt[] to escape." Appellant's Br. at 16 O'Connor testified that he saw Saintil trying to come out of window. Crocco testified that O'Connor told him the same. At this stage, we resolve the dispute in favor of Saintil. *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 415 (3d Cir. 2011) (citation omitted).

[11]     Saintil contends that this was false and from the outside of the exterior common entryway door, they could not have heard Saintil's cell phone, particularly because it was ultimately found charging in the bathroom.

[12]     Saintil argues that Trigueno he described Saintil as a black male with a strong Haitian accent, and that he does not match the description because there is no evidence that Crocco heard Saintil speak. We insert the modifying statement to limit the fitness of the description to Saintil's race and gender.

22) At this point your honor we're . . . requesting a search warrant to go inside that residence.

23) That [58 Graddy Avenue, Apartment A] is confirmed through . . . a visual of that number and letter on the front door of that apartment.

24) We (inaudible) a search warrant for that entire apartment as well as the 1999 black Jeep Grand Cherokee bearing . . . New Jersey [redacted].

25) At this time, I've been speaking with Assistant Prosecutor Lamountain who would also like to charge this individual with hindering apprehension in this investigation.

26) I did do a criminal history on [Saintil], . . . I don't have it in front of me but it was . . . just a drug charge.

SHWARTZ, Circuit Judge dissenting in part.

I agree with the Majority that the District Court correctly granted summary judgment in Defendants' favor on Saintil's excessive force and false imprisonment claims. However, viewing the facts in the reconstructed affidavit in Saintil's favor leads me to also conclude that (1) there was probable cause to believe that a crime was committed and (2) evidence of that crime may have been found in Saintil's home. As a result, the Court properly granted Defendants summary judgment on Saintil's unlawful search and seizure, false arrest, and malicious prosecution claims. See U.S. Const. amend. IV (search and seizure); Zimmerman v. Corbett, 873 F.3d 414, 418 (3d Cir. 2017) (malicious prosecution); James v. City of Wilkes-Barre, 700 F.3d 675, 680, 682-83 (3d Cir. 2012) (false arrest and false imprisonment). Therefore, I respectfully dissent.

I

Contrary to Saintil's assertions, there was probable cause to search his home and car and any purported misrepresentations and omissions were not material. To succeed on a claim that a search warrant lacks probable cause based upon incomplete or false information provided to the issuing judge, Saintil must show that (1) the officer, with at least a reckless disregard for the truth, "made false statements or omissions that create[d] a falsehood in applying for a warrant"; and (2) those misrepresentations or omissions were "material, or necessary, to the finding of probable cause." Wilson v. Russo, 212 F.3d 781, 786-87 (3d Cir. 2000) (internal quotation marks omitted). To assess the materiality of an officer's purportedly false assertions or reckless omissions, the reviewing court prepares a reconstructed affidavit excluding the materially false

1

statements and including the material omissions. Id. at 789. If the reconstructed affidavit still provides probable cause for the search, a plaintiff's claims fail. Id.

Here, the reconstructed affidavit provides probable cause to believe that evidence of the homicide could have been found in the areas to be searched.[1] See Appendix A. The reconstructed affidavit, using facts most favorable to Saintil, reflects that: (1) the police were conducting a homicide investigation; (2) Saintil was an ex-employee of the victim, Mocci, who previously had a dispute with Saintil serious enough to cause Mocci to tell Trigueno that Mocci would kill Saintil if Saintil showed up at Mocci's residence again; (3) a vehicle similar to the one that Saintil owned was seen idling outside the crime scene the night before Mocci's body was found; (4) when the police went to Saintil's home, they saw the lights on but Saintil turned the lights off shortly thereafter; (5) Saintil did not respond to the officers' knock on the door[2] or their phone call; and (6) when the officers went to the rear of the apartment building, they saw an individual resembling Saintil's general description pull back the shade and look through the window. **App. 125, 151, 189-90, 225-27, 266, 281-82, 303-04, 322.** Thus, the reconstructed affidavit provides a substantial basis to conclude that probable cause supported the search.[3] Cf.

_____

[1] To the extent, if at all, the District Court's reconstruction of the affidavit included disputed facts, such errors were harmless because the Majority's reconstructed affidavit uses facts most favorable to Saintil and still shows that probable cause existed.

[2] Although this proved to be a shared exterior door, it was still a necessary entryway into Saintil's apartment, and Saintil confirmed the knock could be heard from his apartment. **App. 151.**

[3] The majority focuses heavily on (1) the timing between Saintil and Mocci's dispute, the subsequent threat that Mocci relayed to Trigueno, and the murder; and (2) whether the neighbor who reported the vehicle outside of the crime scene observed

Maryland v. Pringle, 540 U.S. 366, 370 (2003) (noting the probable cause standard is intended to give "'fair leeway'" to law enforcement (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949))). Accordingly, I would affirm the District Court's order granting summary judgment to Defendants on Saintil's unlawful search claim.

## II

Because there was also probable cause to arrest, detain, and charge Saintil with hindering, the District Court also correctly granted Defendants summary judgment on Saintil's unlawful seizure, false arrest, and malicious prosecution claims. Probable cause exists if "'at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense.'" Wright v. City of Phila., 409 F.3d 595, 602 (3d Cir. 2005) (alterations in original) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). "Whether any particular set of facts suggest that an arrest is justified by probable cause requires an examination of the elements of the crime at issue." Id. The relevant crime here is hindering by concealment or destruction.[4] Under N.J. Stat. Ann. § 2C:29-3b(1),

anyone exit the vehicle at that time. Neither of these items change the existence of probable cause. More specifically, even if there was a lapse of time between the threat and the murder, there exists a basis to infer that there were hostile feelings between the Mocci and Saintil. Moreover, the absence of seeing some exit the car does not undermine the information the officers received that a car similar to Saintil's was parked near Mocci's home at a relevant time.

[4] Although Saintil was originally arrested for hindering by force (§ 2C:29-3b(2)), he was later charged with hindering by destruction (§ 2C:29-3b(1)). So long as there was probable cause for the latter, however, that he was originally arrested for the former is

3

hindering one's own apprehension or prosecution requires that "[the] defendant (1) knew he might be charged with a crime; (2) suppressed, either by concealment or destruction, evidence of the crime which could have led to charges against him; and (3) acted with purpose to hinder his apprehension or the investigation." State v. Abdullah, No. A-3723-17, 2021 WL 2623185, at *6 (N.J. Super. Ct. App. Div. June 25, 2021) (citation omitted).

Based on the facts from the reconstructed affidavit, a prudent person would perceive the events, as the officers did, that Saintil's evasive acts and refusal to come to the door showed that he (1) knew he might be charged with Mocci's murder, (2) failed to answer the door so that he could conceal or destroy potential evidence in his home, and (3) did so to hinder his own apprehension or the investigation into Mocci's murder. Accordingly, because probable cause for a hindering charge existed, Saintil's unlawful seizure, false arrest, and malicious prosecution claims also fail.

III

For the foregoing reasons, I would affirm the District Court in all respects.

---

immaterial. See District of Columbia v. Wesby, 583 U.S. 48, 54 n.2 (2018) (holding "an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking" (citation omitted)).